**Delbert PAULINO, Petitioner–Appellant,**

v.

**R.A. CASTRO, Warden, Respondent–Appellee.**

No. 02–55924.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 2004.

Filed June 14, 2004.

Terri A. Law, Sherman Oaks, CA, for the petitioner-appellant.

Bill Lockyer, Attorney General of California, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Donald E. De Nicola, Deputy Attorney General, and Stephanie A.

Mitchell, Deputy Attorney General, Los Angeles, CA, for the respondent-appellee.

Before: KOZINSKI, O'SCANNLAIN and SILVERMAN, Circuit Judges.

KOZINSKI, Circuit Judge:

Petitioner Delbert Paulino is serving a life sentence, plus one year, without the possibility of parole. A California jury convicted Paulino of kidnapping for robbery in violation of section 209(b) of the California Penal Code, second-degree robbery in violation of section 211, and first-degree murder in violation of section 187(a), for his participation in the events leading to the killing of Aundray Boykins. The California Court of Appeal affirmed Paulino's conviction in an unpublished opinion, and the California Supreme Court summarily denied his petition for review.[1] Paulino petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 104, 110 Stat. 1214, 1218–19 (1996). Adopting the magistrate judge's report and recommendation in full, the district court dismissed Paulino's petition with prejudice. He appeals. We review de novo. *Dows v. Wood,* 211 F.3d 480, 484 (9th Cir.2000).

1. Seven months after Boykins's killing, the Los Angeles Police Department brought Paulino in for questioning. At the police station, Detective Robert Felix elicited a number of inculpatory statements from Paulino regarding his role in a scheme to rob Boykins, which culminated in the fatal shooting of Boykins by one of Paulino's accomplices. Paulino unsuccessfully sought to suppress these statements at his preliminary hearing and again at trial. He asserts that the statements were inadmissible because they were taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and that the court of appeal's determination that their admission at trial was proper was objectively unreasonable.[2] *See* 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

The parties do not dispute the relevant historical facts as found by the court of appeal:

When appellant [Paulino] was first brought in for questioning, Detective Robert Felix introduced himself and advised appellant pursuant to *Miranda v. Arizona.* Appellant stated that he understood his rights and wanted to talk. On a printed admonition and waiver form, appellant initialed each of the four admonitions and wrote "yes" next to questions asking whether he understood each of these rights and wished to give up his right to remain silent. He did not fill in the item asking whether he wished to give up his right to speak with an attorney and to have the attorney

---

1. We therefore review the court of appeal's disposition as the relevant state-court decision. *Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir.2000).

2. In light of our following discussion, we need not address the state's contention that *Edwards* is not a constitutional rule binding upon state courts in criminal trials—an argument that is, in any case, implicitly foreclosed by *Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.2003) (applying *Edwards* as clearly-established law). Further, we decline to address the state's conclusory allusion to *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), at page 20 of its brief. *See Arredondo v. Ortiz,* 365 F.3d 778, 781–82 (9th Cir.2004).

present during questioning. However, he wrote "I want to talk to Felix" and signed the form.

Detective Felix activated a hidden tape recorder, reiterated appellant's rights to silence and counsel, and asked appellant if he understood. Appellant inquired, "Where's the attorney?" Felix asked if appellant understood the question, and appellant repeated, "Where's the attorney?" Felix explained that there was "[n]o attorney here but if you want one before I ask you these questions I'm gonna ask you, you have a right to do that." Appellant asked, "You mean it's gonna take him long to come?" Felix responded, "Well, I'm just asking you a question, man—do you, do you want to talk to me?" Appellant replied, "Okay, I want to talk to you but I wanna know what's going on." Felix stated that he would explain what was going on, and appellant said, "I want to talk to you Detective Felix."

*People v. Paulino,* No. B118902, at 2–3(Cal. Ct.App. June 2, 1999) (citation omitted) (alteration in original).

At the preliminary hearing, Felix explained how he had advised Paulino of his rights: [3]

THE WITNESS [Felix]: [I said,] "If you give up the right to remain silent, anything you say can and will be used against you in a court of law. Do you understand that?"

He said, "Yes."

BY MS. MODDER [prosecutor]:

Q: Did he say anything else about that right?

A: He said, "I want to talk to you."

Q: Okay.

The next right?

A: "You have the right to speak with an attorney and have that attorney pres-

ent when questioned if you so desire. Do you understand that?"

He said, "Yes."

Q: Did you ask him anything else?

A: The final question, I asked him, "If you so desire and can't afford an attorney, one will be appointed for you without any cost. Do you understand that?"

Q: What did he say?

A: He said, "Yes. I want to talk to you."

R.T. of Prelim. Hearing at 42–43.

■ **a.** Paulino first contends that he did not waive his right to counsel after being advised of his *Miranda* rights. Paulino does not argue that he was coerced and the waiver was therefore involuntary. Nor does he suggest that he lacked "full awareness of both the nature of . . . [his] right . . . and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (*Miranda* waiver valid only if voluntary, knowing and intelligent). Rather, he points out that the right to silence and the right to counsel are distinct concepts, *Michigan v. Mosley,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and frames the issue as whether his agreement to talk with Felix waived his right to counsel. That is, he focuses on the legal significance of his telling Felix that he wanted to talk and writing "I want to talk to Felix" at the bottom of the advisement form. *Cf. United States v. Cheely,* 36 F.3d 1439, 1447 (9th Cir.1994).

■ "Even when a right as fundamental as that to counsel . . . is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case . . . .' " *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (quoting *John-*

---

**3.** In ruling on Paulino's renewed motion to suppress, the trial court considered, inter alia, a transcript of Felix's preliminary-hearing testimony.

son v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). In *Butler*, the North Carolina Supreme Court concluded that defendant had not validly waived his right to counsel when he stated that he understood his rights, refused to sign a waiver and stated, "I will talk to you but I am not signing any form." *Id.* at 371, 99 S.Ct. 1755. Butler "said nothing when advised of his right to the assistance of a lawyer," and never requested a lawyer. *Id.* The state supreme court concluded that *Miranda* required an express waiver. *Id.* at 372, 99 S.Ct. 1755. The Supreme Court vacated the state court's judgment and remanded, holding that"[a]n express written or oral statement of waiver ... is not inevitably ... necessary ... to establish waiver." *Id.* at 373, 99 S.Ct. 1755.

Paulino said he understood his rights— in particular, his right to counsel—and said he wanted to talk. Moreover, when specifically advised of the right to counsel, far from being silent, he actually repeated, "I want to talk to you." Paulino also wrote "I want to talk to Felix" at the bottom of the advisement form. In light of *Butler's* admonition that an express statement is not necessary to establish waiver, we cannot say that the court of appeal was objectively unreasonable in finding that Paulino's verbal and written responses to Felix's advisement of the right to counsel, when considered in context, constituted a waiver of that right. Nor was the court of appeal unreasonable in concluding that the ambiguity of Paulino's subsequent written confirmation of his waiver did not undermine the latter.

**b.** Paulino argues that his failure to confirm the waiver of his right to counsel in writing, together with his queries, "Where's the attorney?" and "You mean it's gonna take him long to come?", sufficed to invoke his right to counsel. The state court of appeal concluded that the absence of Paulino's signature on the waiv-

er form did not "unambiguously reflect a request for counsel" and that his "questions regarding the location of counsel and how long it would take counsel to arrive ... [c]onsidered either singly or collectively ... were not a sufficiently clear articulation of his desire to have counsel present." *Paulino*, No. B118902, at 9–10.

■ Invocation of counsel sufficient to trigger the protections of *Edwards* "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Whether a statement is an unambiguous request for counsel "is an objective inquiry" and, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, ... [Supreme Court precedent] do[es] not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

Paulino relies on *Alvarez v. Gomez*, 185 F.3d 995(9th Cir.1999), and *United States v. Cheely* to tie these established rules of law to the facts of his case. See *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir.2000) (circuit case law may be persuasive authority for habeas purposes). In *Alvarez*, a pre-AEDPA habeas case, defendant asked three questions that we deemed an unequivocal request for an attorney: "(1) 'Can I get an attorney right now, man?' (2) 'You can have attorney right now?' and (3) 'Well, like right now you got one?'" 185 F.3d at 998. Viewed collectively, we said, defendant's repeated questions about the immediate availability of an attorney clearly invoked his right to counsel. *Id.*

In *Cheely*, the suspect acknowledged that he understood his rights, but declined

to waive them in writing. 36 F.3d at 1446. One of the inspectors who questioned Cheely testified, "[Cheely] told me that he didn't think he need—he told me that he didn't think he wanted to sign" the waiver form, and that "he didn't think his attorney would want him talking to us." *Id.* at 1447. On direct review, we concluded that the combination of Cheely's written acknowledgment of his rights, his refusal to waive his right to counsel in writing, and his explanation that his attorney would not want him to speak with the inspectors served to unequivocally invoke the right to counsel. *Id.* at 1448.

Neither case helps Paulino. In *Alvarez*, two of the questions posed by defendant were like Paulino's queries to the extent that they concerned the immediate availability of counsel. However, Alvarez's first inquiry—"Can I get an attorney right now, man?"—clearly expressed his desire for an attorney in dealing with police interrogation. By contrast, Paulino's queries, "Where's the attorney?" and "You mean it's gonna take him long to come?", could be construed as inquiries into the location and availability of an attorney, rather than the assertion of Paulino's subjective desire for a lawyer at that time.

The facts of Paulino's case are likewise distinguishable from *Cheely*. While Paulino acknowledged his rights and refused to sign a waiver of his right to counsel, he, unlike Cheely, did not explain that refusal. Cheely stated to inspectors that his attorney would not want him to talk to them.

Paulino made no similar affirmative statement, and one could reasonably conclude that his ambiguous queries did not clarify his intentions.

As *Alvarez* and *Cheely* illustrate, we might have reached a different conclusion before AEDPA's enactment or if Paulino's appeal had come to us on direct review. Nevertheless, these cases are distinguishable, and under the constraints of the current habeas statute, we cannot say that the state court of appeal was objectively unreasonable in its conclusion that Paulino failed to unambiguously request counsel. *Cf. Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir.2003) (holding not unreasonable a state-court decision that the statement "I think I would like to talk to a lawyer" is equivocal). As the Supreme Court said in *Davis*, "Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be *affirmatively* invoked by the suspect." 512 U.S. at 461, 114 S.Ct. 2350 (emphasis added).

2. Paulino next asserts that the court of appeal was objectively unreasonable in determining that the peremptory challenges exercised by the prosecutor did not violate his right to equal protection. *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). During jury selection, defense counsel began to object to the prosecutor's strikes under *People v. Wheeler*, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978):[4]

---

4. The state implicitly suggests that Paulino may be procedurally barred from asserting a claim under *Batson* because defense counsel invoked the pre-*Batson* state case *Wheeler*, not *Batson*, in objecting to the prosecutor's peremptory challenges. The state also argues under *Teague* that no binding precedent requires the California courts to grant relief on Paulino's *Batson* claim in the absence of a proper objection. But we have held that a *Wheeler* motion is the procedural equivalent

of a *Batson* challenge in California. *McClain v. Prunty*, 217 F.3d 1209, 1216 n. 2 (9th Cir.2000); *see also Fernandez v. Roe*, 286 F.3d 1073, 1075 (9th Cir.2002). Thus, Paulino's objection at trial preserved his *Batson* claim for our purposes.

In addition, the state fleetingly argues that granting Paulino relief because he raised an inference of bias based only on statistical disparities would involve the application of a new rule under *Teague*. This argument is

MR. PATTON [defense counsel]: There would be a *Wheeler* motion at this point. It seems that the People have exercised peremptory challenges in a way most unsatisfactory, and would not reflect the jury—

THE COURT: Let's go over it.

Juror number three was a black female. That was the second peremptory exercised by the People so you have juror number three, black female.

She had been arrested for nude sun bathing. She gave a lot of answers that I thought she knew a lot of people had been arrested. And I thought that there were objective reasons for that excusal.

R.T. at 186–87. At the time of the objection, the prosecutor had exercised six peremptory challenges, five of them against potential black jurors, and had accepted one black juror. The trial court proceeded to evaluate each of the prosecutor's contested strikes in the same detailed manner that he had assessed the excusal of Juror 3. Immediately after listing possible reasons why the prosecutor struck Jurors 3, 17, 26, 31 and 36, the trial court ruled as follows:

[TRIAL COURT]: Miss Ratinoff [the prosecutor] knows her case better than I do. And I find that there were objective reasons for all of these jurors to be excused. And at this point I find no prima facie case because I can see the objective reasons that seem to be present here and that would be my feeling.

If you want to argue it more, I will hear your argument.

MR. PATTON: Well, I would point out as the court has observed the statistical improbability of five out of six is such as to give rise to an inference that these peremptory challenges were in part

frivolous. The state might disagree with the outcome resulting from application of *Batson* to Paulino's case, but that application in-

based upon race. And I would submit it.

THE COURT: Yeah, I think, when I really look at every one of them, I agree with you, it statistically looks bad. But when I look at every one, juror number three and all the people that she knew that had been arrested—and I don't think she told us all the ones she knew. If you kinda go down the line, I can see why Miss Ratinoff would be uncomfortable with each one of them. Based upon that, I find no prima facie case.

*Id.* at 189–90. While defense counsel used "inference" language, the trial court did not specify what standard it employed in evaluating whether Paulino had made a prima facie showing.

*Batson* established a three-step process for evaluating a claim that a prosecutor has exercised peremptory challenges in a racially-discriminatory manner. A trial court must first determine whether a defendant has "ma[de] out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712. If the defendant successfully makes such a showing, "the burden shifts to the State to explain adequately the racial exclusion" with race-neutral reasons. *Id.* at 94, 106 S.Ct. 1712. Only then does the trial court "determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. 1712.

The process employed by the trial court to evaluate Paulino's objection clearly contravened the procedure outlined in *Batson.* The trial court never permitted defense counsel to explain the basis for his objection in the first instance. Instead, the trial court interrupted defense counsel and of-

volves no new rule of constitutional criminal procedure.

fered, sua sponte, its speculation as to why the prosecutor may have struck the five potential jurors in question. But it does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the *real* reason they were stricken. The trial court did not pause to require an actual explanation from the prosecutor, and only after the trial court had made absolutely clear, for all practical purposes, that it would over-rule Paulino's objection did it allow defense counsel an unimpeded opportunity to make the prima facie showing.

The court of appeal acknowledged that the trial court had "reversed the usual order of things" by giving race-neutral reasons for the strikes sua sponte, and only then providing defense "counsel an opportunity to make a prima facie showing." *Paulino,* No. B118902, at 10. But, the court of appeal concluded, Paulino had fallen "short of showing a prima facie case of racial exclusion, as he merely compared the number of challenges to African–Americans to the group's representation in the entire venire." *Id.*

■ We would normally be required to defer to the court of appeal's factual finding that there was no prima facie showing of bias. *See Tolbert v. Page,* 182 F.3d 677, 682 (9th Cir.1999) (en banc). In making this finding, however, the court of appeal explicitly required Paulino to "show a strong likelihood," *Paulino,* No. B118902, at 10, of bias under *Wheeler,* and did not mention *Batson* or its inference standard. We have held that the *Wheeler* standard "is impermissibly stringent in comparison to the more generous *Batson* 'inference' test." *Wade v. Terhune,* 202 F.3d 1190, 1197 (9th Cir.2000). Thus, "California courts in following the 'strong likelihood' language of *Wheeler* are not applying the correct legal standard for a *prima facie* case under *Batson.*" *Id.*[5] Because the court of appeal employed the incorrect legal standard in reviewing Paulino's claim, we examine his *Batson* claim de novo. *Id.; see also Fernandez v. Roe,* 286 F.3d 1073, 1077(9th Cir.2002); *Cooperwood v. Cambra,* 245 F.3d 1042, 1046 (9th Cir.2001).

■ Both Paulino and the stricken jurors in question are black, and thus are members of a cognizable racial group. *See Batson,* 476 U.S. at 96, 106 S.Ct. 1712.[6] Further, at the time defense counsel objected, the prosecution had struck five out of six possible black jurors and accepted only one. In *Turner v. Marshall,* 63 F.3d 807 (9th Cir.1995), *overruled on other grounds by Tolbert,* 182 F.3d at 684, we concluded that "the prosecutor's exclusion of five out of nine available African–Ameri-

---

5. The state implies that the court of appeal applied the proper standard for demonstrating bias because the California Supreme Court has clarified that *Wheeler's* "strong likelihood" standard is the same as *Batson's* "inference" standard. *See People v. Box,* 23 Cal.4th 1153, 1188 n. 7, 99 Cal.Rptr.2d 69, 5 P.3d 130 (2000). While *Box* so held, it also acknowledged that a court of appeal's holding to the contrary in *People v. Bernard,* 27 Cal. App.4th 458, 32 Cal.Rptr.2d 486 (Ct.App. 1994), had created confusion as to the similarity between the two standards, and therefore overruled *Bernard.* Thus, as we explained in *Cooperwood v. Cambra,* 245 F.3d 1042, 1047 (9th Cir.2001), we continue to review de novo in pre-*Box* cases where the state court employed *Wheeler's* "strong likelihood" standard. Here, the court of appeal employed that standard in affirming Paulino's conviction—and the California Supreme Court denied Paulino's petition for review—in 1999, before *Box* issued in 2000. Thus, we review de novo under *Wade. See id.*

6. The defendant and the stricken jurors need not be members of the same racial group. The Supreme Court has "liberalized *Batson* and abolished the requirement that the defendant and the stricken juror share the same race." *Tolbert,* 182 F.3d at 680 n. 4 (discussing *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

can venirepersons removed a sufficient percentage of African–Americans to establish a pattern of discrimination." *Id.* at 813. We so held even though "the prosecutor did not attempt to remove all the African–American jurors," *id.*, and "four African–American women remained on the jury," *id.* at 811. Thus, in *Turner*, it was sufficient that the prosecutor had removed roughly 55 percent of potential black jurors and permitted four to sit. Paulino has similarly raised an inference of discrimination, as over 83 percent of possible black jurors were excluded by the prosecutor in his case.

In addition, the prosecutor used five out of six, or over 83 percent, of its peremptory challenges to strike blacks. In *Turner*, the prosecutor used five out of its nine peremptories to exclude black venirepersons, a statistic that we said also raised an inference of discrimination. *Id.* at 813. Thus, the percentage of peremptories the prosecutor exercised against blacks in Paulino's case further supports an inference of bias.

Of course, we are looking at the pattern of strikes only at the time of Paulino's objection. We sometimes consider whether the context in which a defendant made a *Batson* objection changes the significance of a statistical pattern in the exercise of peremptory challenges. In *Wade*, for example, petitioners argued that, when the prosecution struck the prospective juror at issue, "one of three (or 33%) of the prosecutor's peremptory challenges had been exercised against an African–American, when only four of sixty-four (or 6%) of the prospective jurors in the venire were African–American." 202 F.3d at 1198. As we explained, however, the small size of the sample of blacks in the venire diminished the significance of a comparison between these percentages. *Id.* Further, we noted that the percentage of potential black jurors struck can change depending on when

the defendant objects. If a black juror "is the first person called, and thus the first person struck, all (or 100%) of the prosecutor's peremptory challenges will have been exercised against African–Americans," whereas if the same juror is "called at the end of the *voir dire*, the percentage may be far lower." *Id.*

■ Our analysis in *Wade* in no way diminished the principle that a defendant can make a prima facie showing based on statistical disparities alone. *See, e.g., Fernandez*, 286 F.3d at 1077–80 (finding defendant made a prima facie showing based on only statistical disparities). Rather, we simply noted that sample size, or the time at which a statistical pattern is pointed out, may be relevant to the weight of the apparent disparity.

Here, the state does not point to anything in the record that would alter the discriminatory import of the prosecutor's using five out of six peremptory challenges to strike five out of six potential black jurors. Nor do we independently discern from the fragmented state record provided to us any contextual factors that would undermine the plausible inference of bias raised by these numbers. It does appear from the court of appeal's opinion that only one black juror was eventually seated. *Paulino*, No. B118902, at 10. The state perhaps could have rounded out the statistical picture of what occurred during voir dire but, at any rate, it left us with a mere sliver of state record on which to base our decision and did not argue that the timing of the objection, for example, might have influenced the starkness of these disparities.

The state does argue that there are objective, race-neutral reasons supporting the prosecutor's peremptory challenges. While we may consider whether "the record contains entirely plausible reasons, independent of race, why" a prosecutor may

have exercised peremptories, *Wade,* 202 F.3d at 1198, such reasons have usually helped persuade us that defendant made no prima facie showing where defendant challenged the excusal of just one juror. *See, e.g., id.* at 1198–99; *Tolbert v. Gomez,* 190 F.3d 985, 989 (9th Cir.1999). This makes sense: While " 'the Constitution forbids striking even a single prospective juror for a discriminatory purpose[,] . . . the fact that the juror was the one [minority] member of the venire does not, in itself, raise an inference of discrimination.' " *Wade,* 202 F.3d at 1198(quoting *United States v. Vasquez–Lopez,* 22 F.3d 900, 902 (9th Cir.1994). Instead, there must be "[m]ore," *id.,* and the absence of plausible reasons for the strike could be the "more" that gives rise to an inference of bias. If there are such reasons in the record, however, then it's difficult to say that defendant has raised an inference of bias. *See, e.g., Tolbert,* 190 F.3d at 989.

Here, by contrast, Paulino challenges the excusal of five out of six black jurors by means of five out of six peremptories. In explaining how a defendant could make the requisite prima facie showing, the *Batson* Court stated that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97, 106 S.Ct. 1712. As we have explained, *Batson's* "inference" standard "was intended significantly to reduce the quantum of proof previously required of a defendant who wished to raise a claim of racial bias in the jury selection procedure," *Wade,* 202 F.3d at 1197, and thus " 'is not onerous,' "

*id.* (quoting *United States v. Bergodere,* 40 F.3d 512, 516 (1st Cir.1994). Based on the record as presented to us, Paulino has shown a pattern of strikes that raises a plausible inference of discrimination. Thus, under *Batson,* he has made a prima facie showing sufficient to require the prosecutor to explain her actual motivations for her peremptory challenges.

The trial court never required the prosecutor to do so, relying instead on its own speculation as to what might have been the prosecutor's reasons. No evidentiary hearing was held below, so the state has never been required to present evidence of the prosecutor's actual, non-discriminatory reasons for striking the five black jurors. On remand, the district court shall hold a hearing so the state will have an opportunity to present evidence as to the prosecutor's race-neutral reasons for the apparently-biased pattern of peremptories, and determine whether the prosecutor violated *Batson. Cf. Batson,* 476 U.S. at 100, 106 S.Ct. 1712; *Turner,* 63 F.3d at 814.

■ ■ 3. Finally, Paulino argues that he was deprived of due process under *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), because the trial court did not clarify for the jury, sua sponte, the definition of "major participant" in light of *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).[7] Paulino concedes that defense counsel did not contemporaneously object to the jury instruction in question. The state court of appeal addressed on the merits Paulino's contention that the trial court should have

---

7. The jury instruction at issue provides in relevant part:

You cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that the defendant with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery, kidnapping, or kidnapping for robbery which resulted in the death of a human being. A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being.

*See* CALJIC 8.80.1.

used *Tison,* but also clearly and expressly held that the issue was waived because defense counsel consented to the trial court's handling of the issue. In addition, the court of appeal held that Paulino had waived his argument that the trial court had a duty to so instruct the jury sua sponte. Paulino's claim is therefore procedurally barred. *See Coleman v. Thompson,* 501 U.S. 722, 747, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

Paulino fails to demonstrate that we can nevertheless consider his claim. He nowhere argues that California's contemporary-objection rule is unclear, inconsistently applied or not well-established, either as a general matter or as applied to him. *See Melendez v. Pliler,* 288 F.3d 1120, 1124 (9th Cir.2002). Nor does he suggest that there was cause for his procedural default, or that a miscarriage of justice would result absent our review. *See Coleman,* 501 U.S. at 748, 111 S.Ct. 2546; *see also Vansickel v. White,* 166 F.3d 953, 957–58 (9th Cir.1999). Our review is therefore barred by independent and adequate state grounds. *See Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546.[8]

\* \* \*

In sum, we AFFIRM as to Paulino's *Davis* and jury instruction claims, conclude that he has made a prima facie showing under *Batson,* and REVERSE and REMAND for an evidentiary hearing as to his *Batson* claim.

**AFFIRMED in part, REVERSED in part and REMANDED.**

8.  We therefore need not address the state's arguments on the merits.