Filed 8/27/20  P. v. Williams CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAHARRI WILLIAMS,<br><br>    Defendant and Appellant. | 2d Crim. No. B298358<br>(Super. Ct. No. BA463610)<br>(Los Angeles County) |

A jury found Jaharri Williams (Williams) guilty of shooting at an inhabited dwelling (Pen. Code,[1] § 246); assault with an automatic firearm (§ 245, subd. (b)); possession of a firearm by a felon (§ 29900, subd. (a)(1); and discharge of a firearm with gross negligence (§ 246.3).  As to the assault charge, the jury found that Williams personally used a firearm (§ 12022.5).  Williams admitted that he had incurred two prior serious felony "strike" convictions (§§ 667, subds. (a)(1), (b)-(i); 1170.12, subds. (a)-(d).)

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

The trial court sentenced Williams to a total term of 59 years to life. We affirm.

FACTS

Melvin Johnson lived in the front house on a property containing two houses. Johnson's mother, Patrice Tolliver, his girlfriend, Breanna Williams (Breanna), and their two-year-old son, Noah, lived with him. Williams lived in the rear house with Callie Harvey and her children.

On December 4, 2017, Johnson was working on a car in the driveway between the houses at about 4:30 in the afternoon. Noah and the daughter of a friend were on the porch of the rear house. A car driven by Harvey came down the driveway. Williams got out of the car and asked Johnson why his children were always in front of his house. Johnson replied if there is a problem they could take care of it. The men continued to argue. Eventually Williams went into the rear house. Breanna and Tolliver came outside. Breanna and Harvey got into an argument.

Suddenly, Williams came out of the rear house with a gun in his hand. Harvey asked him, "What are you doing?" She tried to get him to take the gun back into the house, but he would not listen to her.

Johnson started moving Breanna, Tolliver, and Noah into the front house. As he did so, Williams raised his hand and fired four shots. Johnson got Breanna and Noah into the house, but Tolliver was still outside. Johnson saw Williams kneel down on the ground and fire two more shots toward the front door of the house. After firing the shots, Williams fled.

There were bullet holes in the screen door to the front house and in a couch, a pillow, and a computer inside the house.

2

Johnson and Tolliver identified the type of gun Williams used as a semiautomatic handgun.

## Prior Incident

Over Williams's objection, the trial court admitted evidence of a prior incident. Enrique Franco testified that in March 2002, he was in front of an apartment house when a car passed by. The car turned around and stopped in front of the apartment. Williams, who was in the passenger seat, began shooting at Franco. Franco ran, but he was shot in the calf. Williams used a black semiautomatic handgun. Franco had no previous contact with Williams.

## Defense

Harvey testified that she had lived in the rear house for about six months. She was not romantically involved with Williams, but he was like a brother to her. Williams did not live with her, but kept some belongings at her house. She was casually dating Calvin Banks.

On the day in question, Banks and Williams were with Harvey when she drove up the driveway between the houses. Banks got into an argument with Johnson. It was Banks who fired the shots. Harvey did not see Williams with a gun.

## DISCUSSION

### I.

### Batson/Wheeler *Motion*

Williams contends the trial court erred in denying his *Batson/Wheeler* motion. (*Batson v. Kentucky* (1986) 476 U.S. 79, 89; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277.)

A prosecutor's use of a peremptory challenge to remove a juror on the basis of the juror's race violates the defendant's right to due process and an impartial jury. (*People v. Wheeler, supra,*

22 Cal.3d at pp. 276-277.) The exclusion of even one prospective juror on the basis of race is structural error, requiring reversal. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158.)

A defendant's *Batson/Wheeler* motion alleging the prosecution has made a peremptory challenge of a juror on the basis of the juror's race requires a three-step analysis. First, the defendant must show a prima facie case by demonstrating that the totality of the facts give rise to an inference of a discriminatory purpose. (*People v. Gutierrez, supra,* 2 Cal.5th at p. 1158.) Second, if the trial court finds the defendant has met his burden of showing a prima facie case, the burden shifts to the prosecution to give a clear and reasonably specific explanation of his legitimate reasons for the challenge. (*Ibid.*) Third, if the prosecution provides a nondiscriminatory explanation, the court must decide whether the defendant has proven purposeful discrimination. (*Ibid.*) We review the trial court's ruling under the substantial evidence standard. (*People v. McDermott* (2002) 28 Cal.4th 946, 970.)

Williams's *Batson/Wheeler* motion was based on the prosecution's peremptory challenge of prospective juror number 3.[2] Prospective juror number 3 was the only African-American juror remaining. The only other African-American prospective juror was excused by stipulation, and her dismissal is not challenged on appeal. Defense counsel expressed concern about her ability to be fair because of her prior experiences concerning crime and law enforcement.

---

[2] The record sometimes refers to prospective juror number 3 as prospective juror number 13, her original placement. For clarity, we refer to the prospective juror as prospective juror number 3 throughout this opinion.

4

Prospective juror number 3 said she is a behavioral therapist. She works with special needs children from five to 15 years old. Most of the children are autistic, but she works with a wide range of children who have special needs. She has worked as a behavioral therapist for a year and a half and enjoys her job. She has a brother who had been arrested for burglary. Her mother had to post his bail. Her uncle has been in and out of jail, and her brother's grandfather was murdered when she was very young.

When Williams made his *Batson/Wheeler* motion, the trial court asked the prosecutor if he would like to respond. The prosecutor stated he challenged the prospective juror primarily because of her occupation. He said, "I do have hesitation when it comes to therapists or anyone in the psychology field." The prosecutor also considered to a much lesser extent than her occupation that her brother had been arrested, her uncle had been in and out of custody, and her grandfather was murdered.

The trial court ruled that Williams failed to establish a prima facie case of racial discrimination. The court stated that it asked for the prosecutor's reasons for the peremptory challenge only out of an abundance of caution to aid in appellate review. The court noted that a potential juror who deals with young children with special needs is often a concern of prosecutors. The court also noted that prospective juror number 3 was very young, and that young age is often a concern of counsel. The court found the prosecutor's peremptory challenge was not based on race.

Indeed, the prosecutor's reason for challenging prospective juror number 3 is obvious, and it has nothing to do with race. Anyone who works as a behavioral therapist is likely to have an

5

abundance of compassion for people who are having difficulty with their behavior.  The prosecutor must prove that the defendant's behavior was criminal.  The last thing the prosecution wants is a juror who is likely to have sympathy for the defendant. Ideally, the prosecution is looking for a juror who will dispassionately view the evidence and the defendant.

Williams points out that the prosecutor did not challenge an occupational therapist.  But an occupational therapist assists people to perform work tasks.  It is far different than a behavioral therapist.  Moreover, the prosecutor pointed out that the occupational therapist was older and had more life experience.

Williams points out that the prosecutor did not challenge a psychology student.  But a psychology student is far different than a practicing behavioral therapist.

Williams also claims that the prosecution did not challenge prospective juror number 6, a special education teacher and former nurse.  But the record shows the prosecution exercised a peremptory challenge for prospective juror number 6.

The record supports the trial court's ruling that the prosecutor's peremptory challenge to prospective juror number 3 was not based on race.

The dissent chides the majority for applying the substantial evidence standard in our review of the trial court's acceptance of the prosecutor's explanation for excusing prospective juror number 3.  Instead the dissent assumes that because the prosecutor did not excuse other jurors with different but what it considers similar professions, there is ipso facto a discriminatory motive for excusing prospective juror number 3.

The dissent writes, "The defendant here was African-American, and *all* prospective African-American jurors were

removed from the panel." The one other prospective black juror was removed by stipulation because the defense wanted her removed.

The dissent urges us to conditionally reverse and remand to give the prosecutor an opportunity to do what he already did, give reasons for the exclusion of prospective juror number 3. To what end? To invent a reason acceptable to the dissent?

We appreciate and share in the dissent's concerns about overt and unintended racial discrimination. The dissent assumes the facts in this case are an example of such discrimination ipse dixit. To ignore our role as impartial judges and to ignore the substantial evidence supporting the trial judge's well-reasoned finding is to abandon our role as impartial judges. We do not disagree with the dissent's passionate concern for racial equality, but such rhetoric is misplaced here. Our commitment to a fair and impartial application of the law matters.

II.

*Prior Incident*

Williams contends the trial court abused its discretion in permitting evidence of an uncharged offense: Franco's testimony that Williams shot multiple shots at him with a black semiautomatic handgun and hit him in the calf.

Williams objected to the testimony as inadmissible character evidence (Evid. Code, § 1101, subd. (a)) and as more prejudicial than probative (Evid. Code, § 352).

Evidence Code section 1101, subdivision (a) prohibits evidence of a person's character or character trait when offered to prove his conduct on a specified occasion. But Evidence Code section 1101, subdivision (b) allows evidence of uncharged conduct when offered to prove a fact other than propensity, such

7

as intent.  The admissibility of such evidence is reviewed for an abuse of discretion.  (*People v. DeRango* (1981) 115 Cal.App.3d 583, 589-590.)

Here the evidence was admitted to show intent.  The prosecutor charged Williams with attempted murder.  That requires the specific intent to kill.  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 664.)  Franco was hit with a bullet fired by Williams.  As the trial court found, Franco's testimony tends to show that Williams intended to hit Johnson, not just shoot in the air.

As to Evidence Code section 352, the trial court could reasonably conclude that the probative value of the evidence outweighed the danger of undue prejudice.  The evidence is highly probative of Williams's intent.  If it were unduly prejudicial, the jury would have found Williams guilty of attempted murder.  Instead, the jury was unable to reach a verdict on two counts of attempted murder.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

I concur:

YEGAN, J.

8

TANGEMAN, J., Dissenting:

I respectfully dissent. This case presents the all-too-common question of whether the prosecutor's use of a peremptory challenge to remove an African-American juror in a criminal trial of an African-American defendant violated the defendant's right to due process and a fair trial. (*People v. Wheeler* (1978) 22 Cal.3d 258, 276-277.)  The law is clear:  removing even one prospective juror on the basis of race requires reversal.  (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158.)

In this case, after one African-American prospective juror was excused by stipulation, the prosecutor used a peremptory challenge to excuse the only remaining African-American from the jury panel.  The ostensible reason:  the prosecutor's "hesitation when it comes to therapists or anyone in the psychology field."  Yet the prosecutor made no peremptory challenge to an occupational therapist, nor to a psychology student; both non-African-Americans.

"Today, as when *Batson* was decided, it is a troubling reality, rooted in history and social context, that our black citizens are generally more skeptical about the fairness of our criminal justice system than other citizens." (*People v. Harris* (2013) 57 Cal.4th 804, 865 (conc. opn. of Liu, J.).)  One reason for that skepticism: "[T]he frequent and disproportionate exclusion of fully capable and qualified black citizens from jury service breeds distrust of law enforcement and 'undermine[s] public confidence in the fairness of our system of justice.'  [Citation.]  It is for this reason that the high court in *Batson* said '[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community.'

1

[Citation.]"  (*People v. Johnson* (2019) 8 Cal.5th 475, 535 (dis. opn. of Liu, J.)  (*Johnson*).)

Our high court has warned that the use of peremptory challenges "permits 'those to discriminate who are of a mind to discriminate.'  [Citation.]"  (*Batson v. Kentucky* (1986) 476 U.S. 79, 96.)  "Only if courts are vigilant can society prevent prejudiced or unscrupulous lawyers from using peremptory challenges as tools for unlawful discrimination.  So when a trial court has even a *suspicion* of discriminatory excusals, clear precedent requires it to act by asking the party exercising the peremptory challenge to explain why the juror is being excused."  (*Johnson*, *supra*, 8 Cal.5th at p. 536 (dis. opn. of Cuéllar, J.), original italics.)

That didn't happen here.  There was clearly a sufficient basis to suspect a discriminatory purpose for the removal of prospective Juror No. 3.  The defendant here was African-American, and *all* prospective African-American jurors were removed from the panel.  Moreover, the voir dire examination of prospective Juror No. 3 on the impact of her profession on her ability to reach a fair verdict was desultory at best:  she was never asked, unlike the occupational therapist, whether her training "as a therapist" would inhibit her ability to determine the question of "what" happened, rather than "why."

The law is clear that "'a prima facie burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference" of discrimination.'  [Citation.]"  (*Johnson*, *supra*, 8 Cal.5th at p. 506, quoting *Johnson v. California* (2005) 545 U.S. 162, 168.)  Among the most relevant factors are "whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate

2

number of strikes against members of that group, whether the party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong." (*People v. Reed* (2018) 4 Cal.5th 989, 999-1000.) Here, virtually all of these factors either militate in favor of finding a prima facie case or do not apply.[1]

Once a prima facie case of unlawful discrimination is made, the burden shifts to the prosecution to set forth legitimate reasons for the challenge. Here, the purported reason was the prosecutor's concern about seating "therapists or anyone in the psychology field" on the jury. Standing alone, this is an adequate explanation. (*People v. Clark* (2011) 52 Cal.4th 856, 907.) But that is not the end of the matter. Where, as here, non-African-American prospective jurors sharing similar characteristics to the excused juror are not challenged, the trial court is *required* to consider the prosecutor's reasons for retaining those prospective jurors while excusing the African-American juror(s). (*People v. Lenix* (2008) 44 Cal.4th 602, 624.) Once again, that didn't happen here.

To be similarly situated, prospective jurors need not be "identical in all respects." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 247, fn. 6 (*Miller-El*).) Such a requirement "would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (*Ibid.*) If the prosecutor's reasons for excluding a prospective juror "applies just as well" to an "otherwise-similar"

---

[1] Although the majority reaches no conclusion on whether the trial court correctly ruled that no prima facie case of discrimination was established, I would conclude that the record easily supports an inference of discrimination.

3

prospective juror, "that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id*. at p. 241.)

Thus, in *Miller-El*, our high court reversed a conviction where the prosecutor excused 10 out of 11 African-American prospective jurors. In doing so, the court stated that "[m]ore powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists that were struck and white panelists allowed to serve." (*Miller-El, supra*, 545 U.S. at p. 241.) This reasoning has consistently been applied in subsequent United States Supreme Court cases. (See *Flowers v. Mississippi* (2019) __ U.S. __ [139 S.Ct. 2228, 2247, 2249] [prosecutor's justification that applies to both the struck juror and one or more seated jurors is evidence of discriminatory intent, regardless of dissimilarities in other respects]; *Foster v. Chatman* (2016) __ U.S. __ [136 S.Ct. 1737, 1751-1752, 1754] [same].)

Here, there were two prospective jurors who shared characteristics similar to those which the prosecutor found wanting in prospective Juror No. 3. For one (the occupational therapist), the prosecutor relied on longer "life experience" and her status as a crime victim (but notably, the prosecutor did *not* rely on differences between the roles of behavioral therapists and occupational therapists). For the other prospective juror, the prosecutor said nothing.

In the third *Batson* stage, the adequacy of the prosecutor's response must "stand or fall on the plausibility of the reasons [they] give[]. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because

4

a trial judge, or an appeals court, can imagine a reason that might not have shown up as false." (*Miller-El*, *supra*, 545 U.S. at p. 252.) "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those results." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924, original italics (*Reynoso*).)

Our high court instructs that it is incumbent on trial courts, when an inference of discriminatory purpose arises, to seek the reasoning employed by the striking party for the strike. Trial courts are precluded from speculation about those reasons because "a direct answer can be obtained by asking a simple question." (*Johnson v. California, supra*, 545 U.S. at p. 172.) Thus, trial courts should not "imagine a [legitimate] reason" when "the stated reason does not hold up." (*Miller-El*, *supra*, 545 U.S. at p. 252.) When the stated reason turns out to be false, unsupported or pretextual, any "new explanation" is highly suspect. (*Id.* at p. 246.)

Thus, in *Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083, 1090, the Ninth Circuit remanded the case to the trial court with directions to hear from and consider the *prosecutor's* reasons for its peremptory challenges, where the trial court improperly offered neutral explanations without input from the prosecutor, noting "[i]t does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the *real* reason they were stricken. The trial court did not pause to require an actual explanation from the prosecutor." (Original italics.) Remand was required "so the state will have an opportunity to present evidence as to the prosecutor's race-neutral reasons for the apparently-biased pattern of

5

peremptories, and determine whether the prosecutor violated *Batson*." (*Id*. at p. 1092.)

The same outcome is required here. Despite the trial court's conclusion (and that of the majority here) that the role of an occupational therapist is "far different" than that of a behavioral therapist, a review of the record reveals that the prosecutor was unaware of such differences and did not offer them as a reason. The prosecutor instead relied upon the occupational therapist's longer "life experience" and history as a "crime victim." While these reasons, if believed, would be evidence of a legitimate non-discriminatory reason for retaining that juror, the comparative juror analysis does not end there, where the defense pointed out that another prospective juror sharing the same characteristics as the excused juror, except for race, was not excused.

Here, the prosecutor stated that he excused prospective Juror No. 3 "primarily" because of a "hesitation when it comes to therapists or anyone in the psychology field" and especially because of her work with children and adolescents (which might allegedly cause the juror to think "what went wrong in this person's life"); but no challenge was made to a non-African-American psychology student whose stated ambition was to become a high school psychologist. Despite the obvious similarities in their professional interests and "life experience," the trial court did not require, and the prosecutor did not offer, *any* race-neutral reasons for retaining the similarly situated non-African-American prospective juror. Instead, the court offered up its own observation that the retained juror "appeared" to be Hispanic, which the court later acknowledged was irrelevant to the question of whether African-Americans were being

6

unlawfully discriminated against.  The prosecutor, however, added nothing to this discussion.  The trial court thus erred when it relieved the prosecution from its "burden of stating a racially neutral explanation for [its] own actions."  (*Miller-El*, *supra*, 545 U.S. at p. 252; see also *Reynoso*, *supra*, 31 Cal.4th at p. 924.)

Thirty-four years ago, Justice Marshall wrote that the "[m]isuse of the peremptory challenge to exclude black jurors has become both common and flagrant."  (*Batson*, *supra*, 476 U.S. at p. 103 (conc. opn. of Marshall, J.).)  In support, he referenced a training manual in the Dallas County Texas District Attorney's Office which "explicitly advised prosecutors that they conduct jury selection so as to eliminate "'any member of a minority group.'""  (*Id*. at p. 104.)

Not much has changed.  According to a recent report by the Berkeley Law Death Penalty Clinic, the practice continues today, only in more subtle form.  (Semel et al., Whitewashing the Jury Box:  How California Perpetuates the Discriminatory Exclusion of Black and Latinx Jurors (June 2020) p. 49 (Whitewashing the Jury Box).)  For example, in Los Angeles County, prosecutors are told to "'bite your tongue'" if their reasons "'sound bogus or pretextual.'"  A training manual instead instructs them to "'Take to court a list of acceptable justifications which have been affirmed on appeal.'"  (*Ibid*.)  And the California District Attorneys Association (CDAA) likewise advises that "any justification that even hints of racism must be avoided . . . [,] if it sounds at all offensive, do not say it.'"  (*Ibid*.)  Instead, the CDAA tells prosecutors to offer "'quotations where it would be most useful to know and emulate particular language that has been deemed proper.'"  (*Id*. at p. 49, italics omitted.)

7

As noted in the report, prosecutors throughout the state (and nation) are provided with lists of "race-neutral" responses to *Batson/Wheeler* objections. The manual Mr. Wheeler Goes to Washington[2] lists 16 race-neutral reasons, and another 18 demeanor-based responses, so prosecutors can "'give detailed verbal expression to . . . subjective instincts.'" (Whitewashing the Jury Box, *supra*, at p. 49.) The Inquisitive Prosecutor's Guide[3] goes even further, listing 77 race-neutral reasons, including such things as: too much or too little education; lack of community or family ties or too many such relationships; or previous service on a hung jury, or a jury that acquitted, or never having sat on a jury at all. (Whitewashing the Jury Box, at p. 50.) As recently as 2006, the CDAA advised prosecutors: "'If possible, keep on the jury one or more members of each cognizable group from which you are challenging persons'" to "'create a record that will justify any challenges you make.'" (*Ibid*.) Similarly, a 2019 Orange County training manual suggests (1) keeping one member of a protected group on the jury if possible, and (2) providing multiple reasons for each peremptory challenge. (*Id*. at p. 49.)

It must of course be acknowledged that not every use of the foregoing suggestions means that the challenge is intentionally discriminatory. But the suggestions operate to provide cover for the striking party's reliance on their own unconscious stereotypes or implicit bias. In his concurring opinion, Justice Marshall warned that the new *Batson* procedure

---

[2] San Francisco County District Attorney's Office, Mr. Wheeler Goes to Washington.

[3] Santa Clara County District Attorney's Office, The Inquisitive Prosecutor's Guide (June 10, 2016).

might prove to be an ineffective tool against implicit bias, noting that a striking party's "'seat-of-the-pants instincts'" about a juror may "be just another term for racial prejudice." (*Batson*, *supra*, 476 U.S. at p. 106 (conc. opn. of Marshall, J.).) That sentiment was recently echoed in *People v. Bryant* (2019) 40 Cal.App.5th 525, 545 (conc. opn. of Humes, P. J.): "*Batson/Wheeler* procedure plainly fails to protect against—and likely facilitates—implicit bias." Because of the danger presented by these unconscious stereotypes, it is imperative that courts remain vigilant in their efforts to root out discriminatory uses of peremptory challenges, whether intentional or resulting from implicit bias.

Because no legitimate non-discriminatory reasons were requested from or provided by the prosecutor for not excusing the would-be high school psychologist, I would conditionally reverse and remand with directions to hear from and consider the prosecutor's reasons for excluding the sole African-American prospective juror while retaining the otherwise-similar non-African-American prospective juror.[4]

NOT TO BE PUBLISHED.

TANGEMAN, J.

---

[4] Although the published cases require the prosecutor to state legitimate reasons for *excluding* prospective jurors, I can discern no rational basis for a different rule when it comes to stating reasons for *not* excusing otherwise-similar jurors, particularly where, as here, the comparison was raised in the trial court. (See *People v. Jones* (2011) 51 Cal.4th 346, 365-366.)

9

Laura F. Priver, Judge

Superior Court County of Los Angeles

_____

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.