Filed 11/4/14  P. v. Paulino CA2/7

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B239878 and B246625 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA138096) |
| v. | |
| DELBERT PAULINO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry and George G. Lomeli, Judges.  Affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant in No. B239879.

Winston Kevin McKesson for Defendant and Appellant in No. B246625.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Scott A. Taryle and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In two appeals, which we consider concurrently, Delbert Paulino appeals from the judgment entered following his conviction of first degree murder (Pen. Code,[1] § 187, subd. (a)), second degree robbery (§ 211), and kidnapping for robbery (§ 209, subd. (b)). He raises two arguments on appeal. First, Paulino asserts that the trial court abused its discretion when it denied, in part, his motion for an in camera review of law enforcement personnel records pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Second, Paulino argues that the trial court erred when it denied his motion to compel discovery of evidence believed to prove a violation of his constitutional right to a jury drawn from a representative cross-section of the community. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Evidence at Trial

Paulino was charged with the murder, robbery, and kidnapping for robbery of Aundra Boykins.[2] On the night of January 3, 1996, Paulino met with Austin Hemsley, Gerald McKenzie, and Equilla Jones. The group devised a plan to rob Boykins, who recently had begun dating Jones and had been seen carrying a large of amount of cash. Paulino, Hemsley, and McKenzie got into Paulino's Ford Thunderbird and followed Jones in her vehicle as she and Boykins drove to a motel. As Jones was parking her vehicle in the motel parking lot, Paulino stopped his car directly behind them. Hemsley and McKenzie got out of the car, grabbed Boykins, and forced him into the backseat. As the other men held down Boykins, Paulino used duct tape to wrap his hands behind his back. Paulino then continued driving while the others searched Boykins in the backseat.

Boykins only had a small amount of cash in his possession, but after being severely beaten by Hemsley and McKenzie, he told them that there was a large sum of

---

[1]     Unless otherwise stated, all further statutory references are to the Penal Code.

[2]     Paulino previously was tried and convicted on these charges, but his judgment of conviction was later reversed by the Ninth Circuit Court of Appeals based on an error in jury selection under *Batson v. Kentucky* (1986) 476 U.S. 79. (*Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083.) This appeal is from the judgment of conviction following retrial.

money in the closet of his home. While Paulino stayed with Boykins in his car, Hemsley and McKenzie went to Boykins's house to search for the money, but eventually returned empty-handed. Paulino kept telling the others that they should let Boykins go because he did not have any money, but Hemsley refused. At Hemsley's direction, Paulino drove the group to a secluded area near a freeway off-ramp, where Hemsley shot Boykins multiple times. Boykins's body was later discovered by the off-ramp. Shell casings recovered near the body were matched to a gun that was found in McKenzie's home with Hemsley's fingerprints on the weapon.

On September 11, 1996, Paulino was detained and taken into police custody. Later that day, he was interrogated by Los Angeles Police Detectives Robert Felix and James Edwards in two recorded interviews. The first interview was audiotaped and the second interview was videotaped. Following the interviews, Paulino also handwrote and signed a detailed statement. In both his interviews with the police and his handwritten statement, Paulino admitted his involvement in the events leading to Boykins's death, but insisted that he did not shoot Boykins or intend for him to be killed. At trial, Paulino testified that he wanted to release Boykins once he realized that the man did not have any money, but he feared that he also would be killed if he let Boykins go free.

## II. The Verdict and Sentencing

The jury found Paulino guilty of one count of first degree murder (§ 187, subd. (a)) with a special circumstance finding that the murder occurred during the commission of a kidnapping for robbery (§ 190.2, subd. (a)(17)), one count of second degree robbery (§ 211), and one count of kidnapping for robbery (§ 209, subd. (b)). As to each count, the jury found true the allegation that a principal was armed with a firearm during the commission of the crime (§ 12022, subd. (a)(1)). The trial court sentenced Paulino to life in prison without the possibility of parole, plus one year on the firearm enhancement.

On February 29, 2012, Paulino filed a notice of appeal from his judgment of conviction (Case No. B239878). On September 13, 2012, following the trial court's

denial of his motion to compel discovery regarding juror allocation methods, Paulino filed a second notice of appeal from the order denying that motion (Case No. B246625).

## DISCUSSION

### I.    Motion for Discovery of *Pitchess* Material

Paulino first argues that the trial court abused its discretion and violated his right to due process when it denied, in part, his *Pitchess* motion for an in camera review of the personnel records of the interrogating officers. Paulino specifically asserts that the trial court erred in limiting the discovery of complaints against Detective Felix to allegations of falsity on *Miranda*[3] waiver forms, rather than all allegations of dishonest conduct by the detective. Paulino also requests that we independently review the sealed transcript of the in camera proceedings to determine if the trial court properly found that there was no discoverable material in Detective Felix's personnel records.

#### A.    Relevant Background

At the preliminary hearing, Detective Felix testified that, prior to interviewing Paulino on September 11, 1996, he presented Paulino with an admonition and waiver of *Miranda* rights form, which Paulino signed. The signed form shows a handwritten date of September 11 or 12, 1992 (rather than 1996) at the top and Paulino's signature at the bottom. The body of the form includes four pre-printed admonitions with Paulino's handwritten initials next to each admonition. It also includes the handwritten word "Yes" next to two pre-printed questions asking whether Paulino understood each of these rights and whether he wished to give up the right to remain silent.[4] There is no response to a

---

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436.

[4]    It appears that, in response to the question asking whether Paulino understood his *Miranda* rights, the word "Yes" may have been written over some other indecipherable handwriting.

4

third pre-printed question asking whether he wished to give up the right to speak to an attorney and have the attorney present during questioning. Beneath Paulino's signature is a handwritten notation stating, "I want to speak to Felix."

At the start of the first audiotaped interview conducted on September 11, 1996, Detective Felix orally advised Paulino of his *Miranda* rights and asked him if he understood those rights. In response, Paulino asked, "Where's the attorney?" Detective Felix answered that there was "no attorney here but if you want one before I ask you these questions I'm gonna ask you, you have a right to do that." Paulino then asked, "You mean it's gonna take him long to come?" Detective Felix responded, "Well, I'm just asking you a question, man – do you want to talk to me?" Paulino replied, "Okay, I want to talk to you but I wanna know what's going on." When Detective Felix stated that he would explain what was going on, Paulino said, "I want to talk to you Detective Felix." Detective Felix then proceeded with the interview during which Paulino admitted his involvement in the crimes against Boykins. In a second videotaped interview with both Detective Felix and Detective Edwards, Paulino again confessed to his role in the crimes.

On August 11, 2010, prior to the start of the retrial, Paulino brought a *Pitchess* motion for discovery of the personnel records of Detectives Felix and Edwards. Paulino specifically sought records of complaints related to each officer's "dishonesty, filings of false police reports, and information regarding [the] officer's credibility, in particular, misrepresentation of witness statements, and the voluntariness of statements and the waiver of *Miranda*." The motion was supported by a declaration from Paulino's trial counsel, which stated, upon information and belief, that Paulino "did not voluntarily waive and give up his right to have an attorney present when questioned by officers," and "did not sign the form given [to] him by officers so as to indicate that 'Yes,' he understood his rights." The trial court initially denied the *Pitchess* motion in its entirety on November 3, 2010.

Paulino thereafter renewed his request for discovery by filing a second *Pitchess* motion. The second motion was substantively the same as the first, but was supported by

5

a sworn declaration from Paulino (as opposed to his attorney). In his declaration, Paulino stated that he "did not voluntarily waive and give up [his] right to have any attorney present when questioned by the officers." He further stated that he "did not sign the form given [to him] by officers," and he "did not cross out the word 'No,' nor did [he] write 'Yes' on the form" in response to the question asking whether he understood his rights.

Paulino's renewed *Pitchess* motion was heard on January 11, 2011. At the start of the hearing, the trial court stated: "I must tell you I'm very skeptical of this claim that the defendant is making that he did not sign the form that is at issue, and my skepticism comes from the fact that this is a retrial of a matter that was tried many years ago and this claim was not raised years ago. But putting this court's skepticism aside, I think I must accept the fact that the defendant has stated under oath that he did not cross out the word "no" on the form and he did not sign the form waiving his *Miranda* rights." After hearing from counsel, the trial court decided that it would conduct a limited *Pitchess* review of Detective Felix's personnel records for past allegations of falsity on *Miranda* waiver forms, but would not review Detective Edwards's personnel records because Paulino's waiver form indicated that only Detective Felix had advised him of his *Miranda* rights.

Paulino's counsel requested that the scope of the trial court's *Pitchess* review include all allegations of dishonesty, rather than being limited to allegations of falsity on *Miranda* forms. In response, the trial court stated: "You have a tape recorded statement of a defendant, and the issue is the defendant is now saying . . . years after conviction, reversal for *Wheeler* error, he's now saying, oh, gee, I did not willingly make that statement. There's no question as to what he said. This is not a question of is Felix lying about what the defendant told him. The question is, did this defendant fill out a form which bears his apparent signature. And it's almost inconceivable to think that a detective could fill out a form, sign the defendant's name, and then the defendant would talk to him and give a confession. It's inconsistent in my view. I suppose -- I mean, we should look at the wording on the confession. . . I just think it's something that comes at a very late time in . . . these proceedings and I think I've made my skepticism clear. So I

6

am going to acknowledge that the defendant says now, I did not sign the form.  But that's the issue to me, . . . has Felix ever been accused of fabricating forms of confessions in his long career as a detective and I'm going to find out."

After conducting an in camera review of Detective Felix's personnel records, the trial court determined that there was no discoverable material.  Back in open court, the trial court noted that the reviewed records included a complaint by Paulino that he was not advised of his *Miranda* rights, but no complaint that Detective Felix had falsified any document relating to his *Miranda* waiver.  The court also noted that Paulino's complaint had been determined to be unfounded, and that documents related to that complaint already had been disclosed to the defense.

## B.    Applicable Law

"For approximately a quarter-century our trial courts have entertained what have become known as *Pitchess* motions, screening law enforcement personnel files in camera for evidence that may be relevant to a criminal defendant's defense."  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225 (*Mooc*) (fn. omitted); see *Pitchess*, *supra*, 11 Cal.3d 531.)  To balance the defendant's right to discovery of records pertinent to his or her defense with the peace officer's reasonable expectation that his or her personnel records will remain confidential, the Legislature has adopted a statutory scheme requiring a defendant to meet certain prerequisites before his or her request may be considered.  (§§ 832.5, 832.7, 832.8; Evid. Code, §§ 1043-1047 [statutory scheme governing *Pitchess* motions].)

Specifically, a defendant seeking discovery of a peace officer's confidential personnel records must file a written motion describing the type of records or information sought, and must include with the motion an affidavit demonstrating good cause for the discovery and the materiality of such evidence to the defense.  (*Mooc*, *supra*, 26 Cal.4th at p. 1226; *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*).)  The information also must be requested with "sufficient specificity to preclude the possibility of a defendant's simply casting about for any helpful information."  (*Mooc*, *supra*, at p. 1226.)  "These requirements ensure that only information 'potentially relevant' to the

7

defense need be brought by the custodian of the officer's records to the court for its examination in chambers. [Citation.]" (*Warrick*, *supra*, at p. 1024.)

Once the trial court concludes that the defendant has satisfied these prerequisites, the custodian of records is obligated to bring to court all documents "'potentially relevant'" to the defendant's motion. (*Mooc*, *supra*, 26 Cal.4th at p. 1226.) The trial court must examine the information in chambers, outside the presence of any person except the proper custodian "and any other persons as the person authorized to claim the privilege is willing to have present." (Evid. Code, §§ 915, subd. (b), 1045, subd. (b); see *Warrick*, *supra*, 35 Cal.4th at p. 1019.) Subject to certain statutory exceptions and limitations,[5] the trial court must then disclose to the defendant "'such information that is relevant to the subject matter involved in the pending litigation.'" (*Mooc*, *supra*, at p. 1226; accord, *Warrick*, *supra*, at p. 1019.) "A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion. [Citation.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

In *Warrick*, the California Supreme Court concluded that, in addition to a specific description of the discovery sought and a demonstration of a logical link between the defense proposed and the pending charge, good cause for *Pitchess* discovery requires only that the defendant present a factual scenario of officer misconduct "that might or could have occurred." (*Warrick*, *supra*, 35 Cal.4th at p. 1026.) The Court also recognized that, depending on the circumstances of the case, the defendant's factual scenario "may consist of a denial of the facts asserted in the police report." (*Id*. at pp. 1024-1025.) At the *Pitchess* discovery stage, a factual scenario is sufficiently plausible when it "presents

---

**5** The trial court must exclude from discovery: "(b)(1) Information consisting of complaints concerning conduct occurring more than five years before the event or transaction that is the subject of the litigation in aid of which discovery or disclosure is sought. [¶] (2) In any criminal proceeding the conclusions of any officer investigating a complaint filed pursuant to Section 832.5 of the Penal Code. [¶] (3) Facts sought to be disclosed that are so remote as to make disclosure of little or no practical benefit." (Evid. Code, § 1045; see also *Mooc*, *supra*, 26 Cal.4th at pp. 1226-1227.)

an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges." (*Id*. at p. 1026.)

### C.  The Trial Court Did Not Err in Partially Denying the *Pitchess* Motion

Paulino contends that the trial court erred when it declined to conduct a *Pitchess* review of Detective Felix's personnel records for any and all allegations of dishonest conduct by the officer, and instead limited the scope of its review to allegations of falsity related to *Miranda* waiver forms.  As described by Paulino, dishonest conduct not only encompasses falsified *Miranda* waivers, but also extends to the filing of false police reports, fabrication of witness statements, coercion of involuntary confessions, and any other matter related to the officer's credibility.  Paulino reasons that complaints regarding any act of dishonesty by Detective Felix were material to the defense theory that Paulino did not voluntarily waive his *Miranda* rights prior to questioning.  We conclude that the trial court did not abuse its discretion in partially denying the *Pitchess* motion.

As our Supreme Court observed in *Warrick*, "a showing of good cause requires a defendant seeking *Pitchess* discovery to establish not only a logical link between the defense proposed and the pending charge, but also to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events.  This court has long required that the information sought must be described with some specificity to ensure that the defendant's request . . . is limited to instances of officer misconduct related to the misconduct asserted by the defendant."  (*Warrick*, *supra*, 35 Cal.4th at p. 1021.)  The specificity requirement accordingly "excludes requests for officer information that are irrelevant to the pending charges."  (*Ibid*.; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1220 (*Jackson*) [where defendant alleged that his confession was coerced, trial court properly limited its *Pitchess* review to complaints against the interrogating officers regarding coerced confessions]; *People v. Hustead* (1999) 74 Cal.App.4th 410, 416 [where only remaining charge against defendant was for evasion of arrest, trial court did not err in denying *Pitchess* request for complaints of excessive force by the arresting officers].)  It also "enables the trial court to identify what

9

types of officer misconduct information, among those requested, will support the defense or defenses proposed," and "establishes the statutorily required materiality prong of the good cause showing that a defendant must make to receive in-chambers review of potentially relevant officer records." (*Warrick*, *supra*, at pp. 1021-1022.)

In this case, Paulino's sole claim of misconduct by the interrogating officers was that Detective Felix falsified his *Miranda* waiver form by crossing out the word "no" and writing "yes" in response to the question asking whether Paulino understood his rights, and then forging Paulino's signature on the form. Paulino did not claim that Detective Felix fabricated any of the statements that Paulino made during the interrogation, or that he coerced Paulino into making incriminating statements about his participation in the crimes. As the trial court observed, because Paulino's interviews with the police were recorded, "there's no question as to what he said" during the interviews, and thus, no claim that Detective Felix was "lying about what [Paulino] told him."[6] In support of his *Pitchess* motion, Paulino did allege that Detective Felix lied in his police report, but that allegation was directed at the statements in the report that Paulino was advised of, and waived, his *Miranda* rights by signing the written waiver form. Paulino did not allege that Detective Felix made any other false statements in his police report, or engaged in any other misconduct in connection with the interrogation. Under these circumstances, the trial court did not err in limiting the scope of *Pitchess* discovery to allegations of falsity in the *Miranda* waiver forms procured by Detective Felix.

---

[6] Paulino asserts that, at the start of the first audiotaped interview, there was a gap in the recording during the time that Detective Felix was orally advising him of his *Miranda* rights, which supports his claim that he did not voluntarily waive his rights. However, Paulino did not allege in his declaration that Detective Felix engaged in any misconduct during the oral *Miranda* advisement, and instead limited his claim of officer misconduct to the alleged fabrication of the written *Miranda* form. Moreover, the transcript of the recording shows that, after advising Paulino of his *Miranda* rights, Detective Felix specifically asked Paulino if he wanted to talk to him, and Paulino unequivocally answered, "I want to talk to you Detective Felix."

10

**D.     The Trial Court Did Not Err in Conducting the In Camera Review**

As discussed, after ruling on Paulino's *Pitchess* motion, the trial court conducted an in camera review of Detective Felix's personnel records and determined that there was no discoverable material.  On appeal, Paulino requests that we independently review the sealed record of the in camera proceedings to determine if the trial court abused its discretion in conducting its *Pitchess* review.  We have reviewed the sealed transcript and conclude that the trial court properly exercised its discretion in finding that none of the material reviewed was discoverable, and therefore, the disclosure of information from Detective Felix's personnel records was not appropriate.  (*Mooc*, *supra*, 26 Cal.4th 1216 at p. 1229; *People v. Hughes*, *supra*, 27 Cal.4th at p. 330.)

**II.     Motion to Compel Discovery Related to Juror Allocation Methods**

Paulino also challenges the trial court's denial of his motion to compel discovery of information pertaining to the Los Angeles County Jury Commissioner's method of allocating jurors.  He contends that the trial court applied the incorrect legal standard in ruling on the motion by requiring him to state a prima facie case of underrepresentation of Blacks and Hispanics in the jury pool.  He further claims that the denial of his motion constitutes reversible error because it deprived him of the constitutional right to a jury drawn from a fair cross-section of the community.

**A.     Relevant Background**

Paulino's case was tried in the Central Judicial District of the Los Angeles County Superior Court.  On August 24, 2011, before voir dire began, Paulino objected to the jury panel.  His counsel stated that he believed the panel was racially exclusive because only two of the first 35 prospective jurors were Black.  The trial court overruled the objection, but decided to ask each prospective juror to identify his or her race in voir dire in addition to answering the standard background questions.  Later that day, during voir dire, Paulino again objected to the panel.  His counsel explained that, based on the responses provided, "almost every single juror in this case is selected from a town north of this courthouse."  He also reiterated his concern about the small number of African-Americans on the panel.

11

The trial court overruled the objection and continued with jury selection. Paulino's jury ultimately was comprised of seven White jurors, four Asian jurors, and one Black juror. According to Paulino, none of the jurors resided in the Central District.

Following the jury's verdict, Paulino filed a motion to compel discovery of information related to the Jury Commissioner's method of allocating prospective jurors for assignment to local courthouses. Paulino specifically contended that the jury venire for the Los Angeles County Superior Court was not drawn from a representative cross-section of the community because African-Americans were underrepresented in the jury venire for the Central District. In support of this claim, Paulino alleged that residents of the Central District, which had a higher percentage of African-American residents than other judicial districts, were being systematically excluded from serving at courthouses within that district based on the Jury Commissioner's allocation methods. Paulino also alleged that, among the prospective jurors assigned to serve in the Central District, African-American jurors were being disproportionately assigned to the Metropolitan Courthouse, where more misdemeanor cases were tried, and excluded from the Foltz Criminal Justice Center, where more felony cases were tried. Paulino supported his motion with statistical information and analysis on the racial demographics in the various judicial districts, and declarations from counsel about their personal observations of jury venires in the Central District.[7]

At a subsequent hearing on Paulino's motion, Gloria Gomez, Director of Juror Services for the Los Angeles County Superior Court, testified about the process of allocating jurors for assignment to local courthouses. As described by Gomez, prospective jurors are randomly selected for service from a computerized master file that combines the list of registered voters and the Department of Motor Vehicles list of licensed drivers and identification cardholders who reside in Los Angeles County. The master file, which is created every 12 to 15 months, contains the name, address, and date

---

[7] The two attorney declarations that Paulino submitted in support of his motion to compel discovery are not included in the record on appeal.

of birth of each person listed, but does not include any information about the person's race or ethnicity. After prospective jurors are randomly selected for service from the master list, a different computerized program assigns them in random order to serve at one of 34 courthouses in Los Angeles County. Jurors are assigned to a courthouse within a 20-mile radius of their residence, with the first preference being an assignment to the courthouse that is closest to the juror's residence. If the courthouse closest to the juror's residence already has a sufficient number of jurors at the time of assignment, the juror will be assigned to the next closest courthouse within the 20-mile radius that needs jurors. Jurors are not assigned according to the judicial district in which they reside, and thus, they may be assigned to a courthouse outside of their district if that courthouse is closest to the juror's residence and requires additional jurors at the time of assignment. The program that makes the assignments does not contain any information about the prospective jurors' race or ethnicity, and accordingly, does not consider race or ethnicity in assigning jurors to a particular courthouse or district. The Jury Commissioner seeks to ensure that jury venires are drawn from a representative cross-section of the community by drawing jurors randomly from the race-neutral master file.

On July 16, 2012, the trial court denied Paulino's motion to compel discovery. In a detailed written decision, the court concluded that Paulino had "failed to satisfy the requisite burden for the granting of [his] discovery motion, which is to say of establishing a 'particularized showing' supporting a reasonable belief that the alleged underrepresentation of African Americans or Hispanics in the jury venire exists as the result of a practice of systematic exclusion."

### B.    Applicable Law

"Under the federal and state Constitutions, a defendant is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; [citations].) This guarantee mandates that courts select juries from pools that do not systematically exclude distinctive groups in the community. [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 255.) "The relevant 'community'

13

for cross-section purposes is the community of qualified jurors in the judicial district in which the case is to be tried. [Citations.]" (*People v. Currie* (2001) 87 Cal.App.4th 225, 233.)

"[T]o establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364 (*Duren*); see also *People v. Burgener* (2003) 29 Cal.4th 833, 856.) "Where . . . a county's jury selection criteria are neutral with respect to the distinctive group, the defendant must identify some aspect of the manner in which those criteria are applied that is not only the probable cause of the disparity but also constitutionally impermissible. [Citation.]" (*People v. Burgener*, *supra*, at p. 858.) "'If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. [Citations.]'" (*Id.* at p. 856.)

"In order to investigate whether the court has failed to draw a jury from a representative cross-section of the community, . . . a defendant has certain rights to discovery." (*People v. Lucas*, *supra*, 60 Cal.4th at p. 255.) In *People v. Jackson*, *supra*, 13 Cal.4th 1164, the California Supreme Court held that, where a defendant's request for discovery of information relevant to jury selection procedures is denied, "we consider not whether defendant has made a prima facie case, but the prior question of whether defendant was wrongly denied the discovery of information necessary to make such a case." (*Id* at. p. 1194.) Rather than establishing a prima facie case of systematic underrepresentation, a defendant need only make "a particularized showing supporting a *reasonable belief* that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion." (*Ibid*., italics added.) Upon such a showing,

14

"the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent." (*Ibid.*) "'[A] "reasonable belief" is simply a "conviction of mind . . . arising by way of inference" [citation], a "belief begotten by attendant circumstances, fairly creating it, and honestly entertained." [Citation.]' [Citation.]' (*Roddy v. Superior Court* (2007) 151 Cal.App.4th 1115, 1135, italics omitted.) A trial court's "ruling on a discovery motion is subject to review for abuse of discretion." (*People v. Prince* (2007) 40 Cal.4th 1179, 1232.)

### C.      The Trial Court Did Not Err in Denying the Discovery Motion

Paulino argues that the trial court erred in denying his motion to compel discovery by incorrectly deciding the case under the *Duran* test, which required him to establish a prima facie case of systematic underrepresentation in the jury selection process, rather than the *Jackson* test, which merely required him to demonstrate a reasonable belief that underrepresentation in the jury venire existed as a result of systematic exclusion. Paulino also asserts that he satisfied his burden of proof under the *Jackson* test, and was thus entitled to discovery to verify a violation of his constitutional right to a jury drawn from a representative cross-section of the community. We conclude that the trial court properly denied Paulino's motion.

First, Paulino fails to provide any support for his claim that the trial court applied the incorrect legal standard in ruling on his motion, and the record on appeal establishes that there was no such error. In its written ruling, the trial court correctly set forth the applicable law, stating that "[i]n order to be entitled to discovery on the issue of juror information, . . . a defendant, must first establish a 'particularized showing' supporting a 'reasonable belief' that underrepresentation in the jury pool or venire, in the instant case African-Americans and Hispanics, exists as the result of practices of systematic exclusion." After reviewing the evidence proffered by Paulino in support of his motion,

15

the trial court found that he "failed to satisfy the requisite burden for the granting of [his] discovery motion, which is to say of establishing a 'particularized showing' supporting a reasonable belief that the alleged underrepresentation of African Americans or Hispanics in the jury venire exists as the result of a practice of systematic exclusion." The trial court did not make any reference to the *Duren* test in ruling on the motion, but rather properly applied the *Jackson* test in deciding whether Paulino had satisfied his requisite burden.[8]

Second, the trial court did not abuse its discretion in ruling that Paulino had failed to make the particularized showing required for discovery under *Jackson*. As Gomez testified, the Los Angeles County Superior Court randomly selects prospective jurors from a master list that is comprised of the list of registered voters and the list of drivers and identification cardholders from the Department of Motor Vehicles after being purged of duplicate names. Code of Civil Procedure section 197, subdivision (b) specifically provides that "[t]he list of registered voters and the Department of Motor Vehicles' list of licensed drivers and identification cardholders resident within the area served by the court, are appropriate source lists for selection of jurors," and that "[t]hese two source lists, when substantially purged of duplicate names, shall be considered inclusive of a representative cross section of the population." The California Supreme Court likewise has held that the combination of these source lists "'"'shall be considered inclusive of a representative cross-section of the population'" where it is properly nonduplicative.' [Citation.]" (*People v. Burgener*, *supra*, 29 Cal.4th at p. 857.) Because the County's jury selection criteria are neutral with respect to race and ethnicity, Paulino had the burden of establishing the basis for a reasonable belief that the manner in which those criteria are being applied is the probable cause of the alleged disparity and is constitutionally

---

[8]     The trial court did apply the *Duren* test in ruling on a separate motion to quash a jury venire, which was brought by a different defendant but considered in conjunction with Paulino's motion to compel discovery.

impermissible.  (*Id*. at p. 858; *Jackson*, *supra*, 13 Cal.4th at p. 1195.)  Paulino did not meet his burden here.

"Statistical underrepresentation of minority groups resulting from race-neutral . . . practices does not amount to 'systematic exclusion' necessary to support a representative cross-section claim.  [Citations.]"  (*People v. Danielson* (1992) 3 Cal.4th 691, 706, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  Accordingly, "[a] defendant does not discharge the burden of demonstrating that the underrepresentation was due to systematic exclusion merely by offering statistical evidence of a disparity.  A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process.  [Citation.]"  (*People v. Burgener*, *supra*, 29 Cal.4th at p. 857.)  Furthermore, "[s]peculation as to the source of the disparity is insufficient to show systematic exclusion [citation], as is evidence the disparity is unlikely to be a product of chance [citation] or has endured for some time [citation]."  (*Id*. at p. 858; see *Roddy v. Superior Court*, *supra*, 151 Cal.App.4th at p. 1143 ["it cannot be reasonably believed, based solely on an apparent statistical disparity between a cognizable group's representation in the community . . . and its representation in a master jury list, that either a source list . . . or the practices used in forming that master jury list potentially constitute an improper means of jury selection"].)

In support of his discovery motion, Paulino presented statistical demographic evidence consisting of (1) 2010 census data on the racial and ethnic makeup of the adult population in each judicial district, and (2) a report prepared by a statistician that purports to analyze the probability of obtaining Central District jury panels with a percentage of African-Americans and Hispanics that mirrors their general population percentages in that district.  As described by Paulino, the report "uses a subjective weighing scheme provided by defense counsel that is designed to mirror the venire pools presented to [another defendant] and Paulino with respect to the judicial district of origin of the potential juror."  The report states that when jury venires in the Central District are drawn from communities outside the district with lower populations of African-American and Hispanic residents, it becomes very improbable to have a venire panel representation that

17

closely approximates the percentages of African-Americans and Hispanics in the Central District.

As the trial court correctly observed, the statistical evidence offered by Paulino is speculative and conclusory in nature. The statistician's report appears to assert that there is an underrepresentation of African-Americans and Hispanics in the Central District jury venires. However, apart from alleging the bare fact of underrepresentation, the report fails to demonstrate how the purported disparity may be the result of a practice of systematic exclusion. To the extent the report is postulating that the source of the alleged disparity may be the inclusion of jurors outside the Central District in venires within that district, such hypothesis appears to rely on a "subjective" weighing scheme that is not supported by underlying statistical data and is not clearly defined in the report. The report itself also vaguely notes that it is "based on a set of assumptions the veracity of which is difficult to ascertain in the absence of more detailed data." There is nothing in Paulino's proffered evidence which would support a reasonable belief that the Jury Commissioner's method of assigning jurors in random order to courthouses within a 20-mile radius of their residence is an improper means of jury selection. Based on this record, the trial court reasonably could find that Paulino failed to make the particularized showing required for discovery under *Jackson*.

Finally, Paulino asserts that the Jury Commissioner has an affirmative duty to allocate prospective jurors to courthouses in a manner that ensures the resulting jury venires represent a fair cross-section of the judicial district where the case is to be tried. Paulino further reasons that the Jury Commissioner breaches that affirmative duty by drawing jurors randomly from the master list. However, it is well-established that a jury selection process that uses neutral criteria is not constitutionally impermissible in its application merely because it ""may . . . operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw.""" (*People v. Danielson*, *supra*, 3 Cal.4th at p. 706.) As the Supreme Court explained in *People v. Bell* (1989) 49 Cal.3d 502, a state is not required "to create venires that reflect a representative cross-section of the population. The Sixth Amendment forbids the

18

*exclusion* of members of a cognizable class of jurors, but it does not require that venires created by a neutral selection procedure be supplemented to achieve the goal of selection from a representative cross-section of the population." (*Id*. at p. 530.) "So long as the state uses criteria that are neutral with respect to the underrepresented group," a defendant cannot establish a prima facie case of systematic exclusion "by showing the state could have adopted other measures to improve further the group's representation." (*People v. Ochoa* (2001) 26 Cal.4th 398, 427-428.)  Because Paulino failed to satisfy his burden under *Jackson*, the trial court did not abuse its discretion in denying his motion to compel discovery of information related to the method of allocating prospective jurors.

**DISPOSITION**

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

SEGAL, J.*

---

**\***     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.