**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

ALDRIDGE CURRIE,
    *Plaintiff-Appellant*,

v.

NEIL MCDOWELL, Warden,
    *Defendant-Appellee.*

</td><td>

No. 13-16187

D.C. No.
3:11-cv-05194-CRB

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, Senior District Judge, Presiding

Argued and Submitted September 16, 2015
San Francisco, California

Filed June 8, 2016

Before: William A. Fletcher, Marsha S. Berzon,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Bea

# SUMMARY[*]

## Habeas Corpus

Reversing the district court's denial of a habeas corpus petition, the panel held that a prosecutor's peremptory strike of an African American juror violated the Equal Protection Clause.

Under *Batson v. Kentucky*, a claim that a peremptory strike has been used against a juror on the basis of the juror's race is analyzed in three steps.  First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, the state must offer permissible race-neutral justifications for the strike.  Third, the defendant must prove purposeful discrimination by a preponderance of the evidence.

The panel held that the state appellate court violated clearly established federal law in its *Batson* step one analysis.  The panel also held that, even examining the state appellate court's decision under the Antiterrorism and Effective Death Penalty Act's doubly deferential standard, the state appellate court's alternative ground for affirming the trial court, a *Batson* step three analysis, was based on an unreasonable determination of the facts in light of the evidence presented.  The panel concluded that the prosecutor's reasons for striking the juror were all flawed—each reason was either unreasonable, demonstrably false, or applied just as well to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the non-black jurors that the prosecutor allowed to remain on the jury. The panel remanded with instructions for the district court to issue a conditional writ of habeas corpus.

Dissenting, Judge Bea wrote that the state court did not unreasonably apply clearly established federal law or base its decision on factual determinations that were unreasonable in light of the evidence before it.

## COUNSEL

Jay A. Nelson (argued), Law Office of Jay A. Nelson, Portland, Oregon, for Plaintiff-Appellant.

Allen R. Crown (argued), Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Kamala D. Harris, Attorney General of California; San Francisco, California; for Defendant-Appellee.

## OPINION

BERZON, Circuit Judge:

This is the latest case arising out of a jury selected by David Brown, a prosecutor with a history of unconstitutional race-based peremptory strikes. We previously held that Brown violated the Constitution's Equal Protection Clause when he struck three African-American women from the jury of petitioner Aldridge Currie's first trial. *See Currie v. Adams*, 149 F. App'x 615 (9th Cir. 2005). At the retrial resulting from that opinion, the trial judge found that Brown

had violated *Batson* again by striking three African-American prospective jurors.

This case arises out of Currie's second retrial, in which Brown was the prosecutor once again. In this third attempt to prosecute Currie, Brown removed one African American juror via peremptory strike. His stated reasons for striking this juror were all flawed — each reason was either unreasonable, demonstrably false, or applied just as well to the non-black jurors Brown allowed to remain on the jury. Because "[t]he 'Constitution forbids striking even a single prospective juror for a discriminatory purpose,'" *Foster v. Chatman*, No. 14-8349, 578 U.S. __, __, slip op. at 9 (May 23, 2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)), we hold that Currie's habeas petition should be granted.

## I. Background

### A. The *Batson* Framework

This case, like its predecessor cases involving Brown and Currie, centers around the proper application of the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* held that the Fourteenth Amendment's Equal Protection Clause prohibits prosecutors from using a peremptory challenge against a juror on the basis of that juror's race. *See id.* at 89. This prohibition is enforced via *Batson*'s three-step process.

In the first *Batson* step, "the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (citation and

internal quotation marks omitted). Second, if that prima facie case is made out, the state must offer "permissible race-neutral justifications for the strike[]." *Id.* Third, the trial court must decide whether, given all of the relevant facts, the defendant has proven purposeful discrimination. *See Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010).

At this third step, the defendant has the burden of proving purposeful discrimination by a preponderance of the evidence. *See id.* (citing *Batson*, 476 U.S. at 98). The defendant need not prove that all of the prosecutor's race-neutral reasons were pretextual, or even that the racial motivation was "determinative." *Snyder v. Louisiana*, 552 U.S. at 485 (citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). Instead, to prove a *Batson* violation, the defendant must demonstrate that "race was a substantial motivating factor" in the prosecutor's use of the peremptory strike. *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010).

## B. Prior Proceedings

On July 12, 1995, Currie and a man named Santos Maldonado got into an argument about a gun Maldonado had acquired from a mutual acquaintance. Later that day, while Maldonado and his girlfriend were sitting in Maldonado's car, Currie approached Maldonado and asked how much methamphetamine he would sell Currie for $100.00. After Maldonado answered, Currie said that he had money around the corner and left. He returned and shot Maldonado in the neck, then robbed Maldonado of a gold chain, money, and methamphetamine. Maldonado later died due to his injury. Currie is African American, while Maldonado was of Hispanic descent.

Brown successfully prosecuted Currie in California Superior Court, obtaining Currie's conviction for second degree murder, attempted robbery, and being a felon in possession of a firearm. That conviction was affirmed on direct appeal, but we granted habeas relief after finding that Brown had exercised a peremptory challenge in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). *Currie v. Adams*, 149 F. App'x 615 (9th Cir. 2005) ("*Currie I*"). Shortly before we ruled in that case, the Supreme Court held that Brown had committed a *Batson* violation in a separate case, *Johnson v. California*, 545 U.S. 162 (2005).

The state retried Currie in May 2009, with a new judge presiding and Brown again serving as prosecutor. During voir dire, the judge declared a mistrial due to another *Batson* violation by Brown. The court commenced a second retrial with a new jury (again with Brown as the prosecutor). It is that second retrial at issue in today's case.

## C. Jury Selection

Currie's *Batson* claim centers on the striking of a prospective juror named Jones, an African-American woman. Jones made it through the first round of jury selection, during which the court questioned and excused jurors for hardship. The court then described "the nature of the charges" to the jurors who remained, including Jones, and gave those jurors a pair of questionnaires to fill out. After the jurors had completed the questionnaires, they were read the Information against Currie and voir dire began.

During voir dire, Jones was questioned by both the court and Brown; defense counsel did not question her. The court asked Jones only two questions: whether her relationships

with people who have used drugs would prevent her from keeping an open mind during the trial, and whether there was anything else the parties should know about her. Jones answered that she would be able to "keep an open mind," and that there was nothing else the parties needed to know.

Brown's questioning of Jones was slightly longer. The jury questionnaires had asked whether the fact that Currie had been arrested and "charged with these crimes" caused Jones to be "biased against him" or think he "is probably guilty of something." Jones had answered "no" to each question, writing in the comments section to the question "no I don't know what his [sic] is accused of and he is presumed not guilty until proven." Following up on the questionnaire, Brown asked Jones on voir dire "how do you feel about the presumption of innocence?" Jones replied "I can't conclude that he's guilty or not, because I don't know the first thing of the case."

Brown asked Jones several more questions about the presumption of innocence and the prosecutor's burden, and then moved on to other jurors. Later, after asking other jurors about whether they were concerned about the substantial time that had passed since the acts underlying the charges against Currie, Brown briefly turned to Jones and asked "how about you with regards to the time issue? Does that concern you at all?" Jones responded "no." There was no further questioning of Jones that day.

The next day, before the potential jurors had entered, Currie's counsel noted that after the previous day's dismissal of potential jurors for hardship and for cause, only two African-American potential jurors remained in the pool. Brown objected to the idea that defense counsel or the court

could characterize individuals' race based on their appearance, an argument he had made at several points during both of Currie's prior trials. The trial judge stated that he had not been keeping track and so was unable to arrive at his own estimate of the number of African-American potential jurors.

Before the court called in the panel of prospective jurors, Brown noted that there were two jurors that he "didn't get a chance to ask questions of" the previous day — Jones and another juror, Ms. Ruiz. Brown stated that there were some inconsistencies on Jones's questionnaires that he "didn't get a chance to go into," and "those issues caused [him] some concern that [he] didn't get a chance to voir dire on" due to the voir dire time limits. Brown referenced, in particular, question number 21 on the longer questionnaire and question number 10 on the shorter questionnaire.

Question 21 asked "[h]ave you, any member of your family or any close friend(s) ever been ARRESTED?" Jones had marked "yes," and written "friends + family members (arrested for drug related issues.)" Question 10 asked "[h]ave you, a family or household member, or close friend been a victim, witness or defendant in a criminal matter?" Jones had marked "no." Defense counsel stated that he had concerns about a third juror, Mr. Greenslade, and the court decided to conduct "limited supplemental questioning" of the three jurors.

The court asked Jones about her answers to questions 21 and 10, and Jones replied that her answers had been in reference to her brother and cousin. She said that her cousin "is no longer with us. And my brother was out of Alameda County about six years ago." The court confirmed that she felt they had both been treated fairly, and then asked Jones if

she thought either of those relationships would interfere with being objective in the present case. Jones replied "[n]o, not at all." After that round of questioning, the prosecutor and defense counsel used their peremptory challenges to strike Ruiz and Greenslade, respectively, along with several other prospective jurors who had been seated that day.

The court proceeded with empaneling, questioning, and excusing jurors until Currie's counsel accepted the panel. At that point, Brown used a peremptory challenge to strike Jones from the panel. Currie's counsel asked to approach the bench, the court cleared the courtroom, and Currie's counsel moved for a mistrial under *Batson*.

The court noted that Jones was African-American, and that it was appropriate to consider Brown's prior history of *Batson* violations for purposes of determining whether there was a prima facie case of racial discrimination. Nonetheless, the court held that "a prima facie showing has not been made." Before giving Brown a chance to proffer potential race-neutral reasons, the court proceeded, on its own, to volunteer a justification for Brown's strike. It stated that although it had "no reason to disbelieve [Jones] that she believes that [her family members] were treated fairly and would not hold that against the People in the present case," it did not "believe that the prosecutor is required to take the risk that either subconsciously or during the presentation of evidence her feelings may change in light of the very close relationship she has with two people who have been prosecuted." The trial court concluded by saying "it is a reasonable race neutral reason to strike anyone who has a close relative who has been prosecuted. So for that reason based on my observation of the facts, I don't believe a prima facie case has been made."

Having already provided what it regarded as an acceptable reason, the court then allowed Brown to articulate his reasons. Brown stated that "some of those reasons were exactly as stated by the court," and then included Jones's "no" answer to question 10; Jones's statement on the questionnaire that she had family members who had used crack; that it was a particularly close relative who had been prosecuted; and Jones's questionnaire comment that she didn't know what the defendant was "accused of" when the court had described the charges to the jurors before having them fill out the questionnaire. Currie's counsel responded that Jones's answers to questions 10 and 21 were not inconsistent if her family member had been arrested but not charged.

The court reiterated that it denied the motion at the prima facie case stage, and also stated that "the reasons provided are race neutral and are not a sham or a pretext, but are the actual reasons that Mr. Brown exercised the peremptory challenge." It then continued the trial, which resulted in Currie's conviction.[1]

**D. Currie's appeal in state court**

Currie raised his *Batson* challenge on direct appeal in the California Court of Appeal. The Court of Appeal held that the state trial court had correctly applied the *Johnson* standard

---

[1] After conviction, Currie moved for a new trial based on the claimed *Batson* violation as well as other claims. The court denied the motion, reaffirming that "no prima facie case had been shown." The court reiterated its reasons for that finding and added new reasons not suggested by Brown; the state appellate court did not rely on these reasons or even mention them. We therefore do not discuss those reasons here.

in its holding that there was no prima facie case under *Batson*. The court stated that "we will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question," and found that "[s]ubstantial evidence supports the trial court's stated conclusion that Juror J[ones] was not a desirable panelist for the prosecution because she had two relatives who had been arrested for drug offenses, and that consequently, no prima facie case had been made."

The court said that it did not need to engage in comparative juror analysis, disagreeing with Currie that the trial court's analysis of Brown's stated reasons transformed the *Batson* analysis from stage one to stage three. It noted that, were it to treat the case as presenting a stage-three *Batson* analysis, it would affirm the trial court's holding as based on substantial evidence anyway, as it would accord significant deference to the trial court's factual findings were it to engage in a comparative juror analysis. The court then did engage in a limited comparative analysis, examining only the seated jurors' responses to questions regarding crime and drug use among their families and friends. "Drug use did not appear to be nearly as pervasive in the social circles of the seated jurors," the court found, and so Brown "could quite reasonably differentiate between [Jones's] responses and those of the seated jurors." The court affirmed the trial court's rejection of Currie's *Batson* claim. The Supreme Court denied Currie's petition for review in a single-sentence disposition, citing no cases and giving no reasons for the denial.

### E.  Federal habeas proceedings

Currie filed a petition for a writ of habeas corpus in the Northern District of California.  The district court dismissed all but two of Currie's claims as unexhausted, allowing Currie's *Batson* claim and one other claim to move forward.  Citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion), the district court moved directly to the question whether Brown had engaged in purposeful discrimination under *Batson* step three.  The court applied the deferential standard of 28 U.S.C. § 2254(d)(2), finding that the state court of appeal "was not objectively unreasonable in concluding that substantial evidence supported the trial court's finding that the prosecutor did not excuse Juror [Jones] based on her race."  The court denied both of Currie's claims for habeas relief, and certified only the *Batson* claim for appealability.

## II.  The Standard of Review

This Court reviews a district court's legal determinations denying habeas relief de novo.  *Crittenden*, 624 F.3d at 950.  Review of the challenged state court decision is governed by 28 U.S.C. § 2254, which accords a statutory presumption of correctness.  *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).[2]  For habeas petitions alleging a *Batson* violation, "our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by

---

[2] The district court correctly chose the last reasoned state court decision as the decision to review — in this case, the California Court of Appeal's decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

substantial evidence, we must uphold it." *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)).

This deference does not apply where the state court's decision is contrary to or based on an unreasonable application of "clearly established Federal law." 28 U.S.C. § 2254(d)(1); *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007). Here, the state appellate court violated clearly established Federal law in its *Batson* step one analysis by affirming because "the record suggest[ed] grounds upon which the prosecutor might reasonably have challenged the jurors in question," whether or not those were the reasons proferred. "[T]he existence of grounds upon which a prosecutor *could* reasonably have premised a challenge does not suffice to defeat an inference of racial bias at the first step of the *Batson* framework." *Johnson v. Finn*, 665 F.3d 1063, 1069 (9th Cir. 2011) (emphasis added) (internal quotation marks omitted). That principle "was clearly established" for AEDPA purposes in 2005 — years before Currie's retrial — by the Supreme Court's decision in *Johnson v. California*. *Id. Johnson* noted that "[t]he *Batson* framework is designed to produce *actual* answers to suspicions and inferences that discrimination may have infected the jury selection process," 545 U.S. at 172 (emphasis added), and quoted with approval our statement in *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) that "[i]t does not matter that the prosecutor might have had good reasons . . . [;][w]hat matters is the real reason they were stricken." *Id.*

The state appellate court proceeded, however, to engage in a *Batson* step-three analysis as an alternate ground for affirming the state trial court. Considering the state appellate court's prior legal error, whether we should examine only this

alternative holding and apply AEDPA deference, as the district court did, is a debatable question.**³** But it is a question we need not decide, for even examining the holding under AEDPA's doubly deferential standard, we hold that the state court's *Batson* step three analysis was "based on an unreasonable determination of the facts in light of the evidence presented."**⁴** 28 U.S.C. § 2254(d)(2).**⁵**

---

**³** The district court justified moving directly to the *Batson* step three analysis by citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion), which states that the issue of a prima facie showing is moot once the prosecutor's race-neutral explanation is in the record. It is not clear, however, that *Hernandez* applies here. In *Hernandez*, the prosecutor responded to a *Batson* motion by defending his peremptory strike "without any prompting or inquiry from the trial court." *Id.* Here, in contrast, the state trial court initially provided potential reasons that the prosecutor then adopted. But the Supreme Court has clearly stated that the goal of the *Batson* procedure is to uncover "the reasons the prosecutor *actually* harbored for a peremptory strike." *Johnson v. California*, 545 U.S. at 172 (emphasis added) (citation and internal quotation marks omitted). The fact that the prosecutor's stated reasons were supplied in large part by the court itself means that applying *Hernandez* here would be in considerable tension with *Johnson v. California*.

**⁴** The Supreme Court has declined to decide whether § 2254(d)(2) applies when considering a third-stage *Batson* claim under AEDPA, or whether § 2254(e)(1)'s "clear and convincing evidence" standard applies. *See Rice v. Collins*, 546 U.S. 333, 338–39 (2006); *Murray v. Schriro*, 745 F.3d 984, 1001 (9th Cir. 2014) (collecting cases). This Court has previously decided to apply 2254(d)(2) where, as here, the relevant evidence is entirely in the record. *See Ali v. Hickman*, 584 F.3d 1174, 1180 n.4 (9th Cir. 2009). That is the approach we take here.

**⁵** We disagree with the dissent's assertion that it was not clearly established Supreme Court law that courts cannot excuse a potential *Batson* violation based on hypothetical justifications on which a prosecutor could have premised a challenge. *See Johnson*, 545 U.S. at 172; *Finn*, 665 F.3d at 1069. But even if the dissent is correct as to *Johnson* and *Finn*, because we have conducted our analysis under

## III. Discussion

To determine, at stage three, whether a prosecutor's professed race-neutral reasons for striking a juror were pretextual, *Batson* requires an inquiry into "the totality of the relevant facts about a prosecutor's conduct." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). Here, Brown's history of *Batson* violations is one such relevant fact. In *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003), the Supreme Court used the fact that prosecutors belonged to a district attorney's office with a history of racial bias to bolster its finding of a prima facie case. In this instance, it is not only the same office, but the same prosecutor, who brings a history of *Batson* violations with him.

In addition, we find it troubling that Brown's explanations for the strike were largely adopted from reasons the trial judge had already suggested, during his discussion of *Batson* step one. Ordinarily, we give significant deference to a trial judge's assessment of a prosecuting attorney's credibility. *See Batson*, 476 U.S. at 98 n.21. But where a trial court offers reasons before the prosecutor has spoken, it undermines the court's ability to assess that credibility. First, where the prosecutor has been supplied with reasons, the court will have less opportunity to put him or her to the task of articulating his own reasons in his own words. When the prosecutor already knows that a reason will be accepted because the court itself has approved it, the court's chance to perceive active dissembling because of an uncertain or

---

AEDPA's doubly deferential standard, the outcome of the case would be unaffected.

unconvincing explanation diminishes. Second, where a trial judge has already suggested a given explanation, he or she may naturally subject that explanation to less scrutiny than when it is offered by someone else.

With these considerations in mind, we turn to the race-neutral reasons Brown provided to justify striking Jones. First, Brown noted that Jones had several relatives who had used drugs, including two particularly "close relation[s]" (a brother and cousin) who had been arrested for drug offenses. Second, Jones had given inconsistent statements regarding these family members on her questionnaire. Third, Jones said that she did not know what Currie was accused of, even though the charges had been read to her. The record refutes each of these explanations.

### 1.   Jones's family members

Jones marked "yes" to the question "[h]ave you, anyone in your family, any close friends, co-workers, or other contact had a drug problem?" She explained that "several family members have [sic] crack before." The questionnaire asked how this problem had affected her and others, and Jones wrote "it made me value life and the beautiful things it has to offer me. Because I grew up around it, I know what not to do. I choice [sic] to make the right choices." In an earlier question about her feelings and attitudes regarding illegal drugs, Jones remarked "to each his own. It's very sad to see people go through rough times with drug use, but it is their own choice. They are still human even given their struggles."

The state appeals court relied heavily on Jones's statements about her family members in rejecting Currie's *Batson* claim; it was the only one of Brown's reasons that the

court discussed during its comparative juror analysis. The appeals court found that Jones's

> situation was different [from the other potential jurors], in that she had "several" family members who had a problem with crack cocaine, and a very close family member (a brother) who had been arrested for a drug related offense. She also stated in her questionnaire that she had 'friends' who had been arrested for the same reason. Drug use did not appear to be nearly as pervasive in the social circles of the seated jurors, and the prosecutor could quite reasonably differentiate between her responses and those of the seated jurors.

The appeals court's conclusion is unreasonable in light of the evidence before it. Juror 35, in particular, had personally struggled with marijuana, cocaine, and methamphetamine to such an extent that he suffered "multiple gran mal seizures" and "did not drive for appx 6 years." Regarding his "feelings and attitudes about the use of illegal drugs," he put only one word — "empathetic." Despite these statements, Juror 35 was seated. The state appeals court minimized this juror's vivid description of his experience, saying only that he "had tried drugs when he was in his twenties." The seating of Juror 35 severely undercuts Brown's rationale, relied on by both the state appeals court and state trial court, that Jones was struck because of the closeness of her relationship with a drug user.

Moreover, the more general finding that "[d]rug use did not appear to be nearly as pervasive in the social circles of the

seated jurors" is an unreasonable determination of the facts, given that half of the seated jurors had relatives with drug problems and that several of those jurors listed multiple individuals in their lives who had had very serious drug issues: a sister-in-law who left her husband due to drugs; a nephew's wife who "died from drug abuse;" an alcoholic mother; a cousin addicted to cocaine for many years; a niece who is "in and out of drug rehab"; and a niece with a drug problem who "is mentally ill today."  Some of these seated jurors, like Juror 35, made explicit statements of sympathy for those who used illegal drugs.  The seating of all these jurors further undermines the plausibility of the notion that Brown was particularly concerned about seating jurors who might be sympathetic to a defendant whose crime involved purchasing drugs.

### 2.   Jones's allegedly inconsistent statements about her family members.

Jones's questionnaire asked whether she, "a family or household member, or close friend [had] been a victim, witness or defendant in a criminal matter."  Jones answered "no."  Her answer to another question, however, indicated that she had friends and family members who had been arrested.

The state court held this supposed inconsistency a legitimate race-neutral reason. But these answers are not necessarily inconsistent.  If Jones's family member had been arrested but not charged with a crime, for instance, these two answers would be wholly compatible.  The questionnaire even covers this possibility, asking not only whether a friend or family member had been arrested but also whether charges were filed.   Jones clearly marked "no" to this second

question. Nothing in the voir dire testimony shows that these answers were false or could reasonably have been viewed as inconsistent.[6]

More importantly, comparative juror analysis strongly suggests this concern was pretextual. Five of the non-black panelists who ended up being sworn jurors displayed the same pattern in answering these two questions. Hence, the "prosecutor's proffered reason for striking a black panelist applies just as well" to these non-black panelists. *Miller-El v. Dretke*, 545 U.S. at 241. Although this pattern in the answers of the non-black panelists was in the record, neither the district court nor the state court mentioned them.

### 3. Jones's statement that she did not know what Currie was accused of

Brown also said he struck Jones because she stated on her questionnaire that she didn't know what Currie "is accused of," even though the trial judge had informed the potential jurors of the charges. But Jones's statement that she didn't know what Currie "is accused of" is unremarkable even in light of the trial court's instructions.

The trial court told the prospective jurors the formal charges —"second degree murder, attempted robbery and felon in possession of a firearm." It did not go into any detail

---

[6] During voir dire when the judge asked Jones about "your family members who have been in the criminal justice system," Jones stated that "my brother was out of Alameda County about six years ago." It would be possible to interpret that statement to mean that Jones's brother was incarcerated in Alameda County at some point. But that does not mean that he was charged with or convicted of a crime; he could have been in detention at an Alameda County jail after an arrest.

at all about what Currie was alleged to have done — who he allegedly robbed or murdered, or where, why, or how he did so.    And, when it announced the charges, the court specifically admonished the jurors that they should not talk about the case with other people, "even though you don't know anything about it."

After the trial court had made such a statement, and in the context of a question about the presumption of innocence, Jones's statement "I don't know what [he] is accused of" was entirely innocuous.  Jones did not know any of the specific factual allegations involved.  It would be natural and coherent for a person to say, for instance, "I know the defendant is charged with mail fraud, but for all I know he could be accused of lying to his mother or of running an international pyramid scheme."    "Accuse" and "charge" may be synonymous in a technical sense, but this does not mean that Jones's statement, in context, would reasonably cause anyone to doubt her competence or lack of bias.  Brown, moreover, had an opportunity to ask Jones about this inconsistency during voir dire, when Jones stated that she didn't "know the first thing of the case."  But he did not.  Such a "failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."  *Miller-El v. Dretke*, 545 U.S. at 246 (quoting *Ex parte Travis*, 776 So.2d 874, 881 (Ala. 2000)). We therefore conclude that it was unreasonable for the state court to accept this reason as a valid race-neutral explanation for Jones's removal.

* * *

In sum, the record contains clear indications that each of Brown's reasons for striking Juror Jones was a pretext, and it was unreasonable for the state court to hold otherwise. The state court unreasonably downplayed a seated juror's personal experience with drugs and the many other jurors who had ties to individuals with tragic drug-related experiences. Jones's alleged inconsistency in two questionnaire questions was not, in fact, an inconsistency at all, and five of the seated jurors had answered the questionnaire identically. And Jones's statement that she did not know what Currie was accused of is entirely understandable and not reasonable grounds to doubt her abilities as a juror.

Even if the state appeals court had not erred in its acceptance of one of these reasons, it unreasonably determined the facts by analyzing only one of Brown's justifications — that Jones had close relatives who had used drugs — for pretext. A court does not need to find all of a prosecutor's race-neutral reasons pretextual to find impermissible racial discrimination. *See Kesser*, 465 F.3d at 360. The relevant inquiry for *Batson* purposes is whether "race was a substantial motivating factor." *Cook*, 593 F.3d at 815; *see also Snyder*, 552 U.S. at 485. If a prosecutor supplies enough reasons for a strike, it may well be likely that one of those reasons is plausible. But it remains the case that implausible justifications "may (and probably will) be found to be pretexts for purposeful discrimination." *Miller-El v. Cockrell*, 537 U.S. at 339 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Courts applying the *Batson* procedure therefore cannot stop investigating after finding one of a prosecutor's multiple proferred reasons plausible. As is evident here, finding multiple other reasons to be pretextual

may well lead to the conclusion that the prosecutor's strike was discriminatory.[7]

## IV. Conclusion

Brown's history of *Batson* violations and pretextual reasons in this case lead us to conclude that "race was a substantial motivating factor" for his strike of Jones. *Cook*, 593 F.3d at 815. The California Court of Appeal's rejection of Currie's *Batson* claim was based on an unreasonable determination of the facts, as it largely ignored the similar extent of drug use in Jones's social circles and those of the empaneled jurors, and it uncritically accepted Brown's other stated reasons. We therefore conclude that the district court erred in rejecting Currie's habeas petition. We reverse, and remand with instructions to issue a conditional writ of habeas corpus requiring Currie's release from custody unless the State elects to retry Currie within a reasonable time period to be determined by the district court.

**REVERSED and REMANDED.**

BEA, Circuit Judge, dissenting:

Aldridge Currie has been twice tried and twice convicted for the murder of Santos Maldonado. The California Court of Appeal did not unreasonably apply "clearly established

---

[7] It is also for this reason, among others, that we are unpersuaded by the dissent. The dissent emphasizes a single reason for striking Jones — her family members with a history of drug-related arrests — and, finding it plausible, overlooks the rest of the troubling evidence in the record.

Federal law, as determined by the Supreme Court of the United States", when it affirmed Currie's conviction following his retrial in 2008. 28 U.S.C. § 2254(d)(1). Furthermore, the court's decision was not "based on an unreasonable determination of the facts in light of the evidence" before it. *Id.* § 2254(d)(2). Accordingly, Currie's habeas petition "shall not be granted." *Id.* § 2254(d). Since federal courts are statutorily barred from granting Currie's habeas petition, I would affirm the district court's denial of his petition.

## I.

Currie killed his drug dealer, Maldonado, on the night of July 12, 1995. That night, Currie first asked Maldonado for methamphetamine, and Maldonado offered to sell some. Currie then walked away from Maldonado for a few minutes. Currie came back with a gun and fatally shot Maldonado in the neck. According to one witness, Currie took drugs and money out of Maldonado's pockets before fleeing the scene. According to another witness, Currie appeared desperate to get drugs. Currie smoked drugs that night, and according to a toxicologist there was cocaine and methamphetamine in Maldonado's blood at the time of his death. At trial, Currie testified that he killed Maldonado because they argued about a gun that night and Currie believed that Maldonado was going to shoot him. The jury also heard that Currie had previously been convicted of possessing and transporting drugs.

## II.

This appeal concerns the constitutionality of the jury selection process during Currie's retrial in California state

court. During the first round of jury selection, the prosecutor struck four prospective jurors, none of whom was African American. The trial court moved on to the second round of prospective jurors. Juror Jones was a member of this second group. The trial judge questioned Juror Jones about arrests of her close family members, and Jones stated that both her brother and her cousin had been arrested for suspected drug crimes. The prosecutor struck Juror Jones from the panel. This was the first and only time that the prosecutor struck an African American juror from the jury that retried Currie. There was one other African American prospective juror in the venire, but a full jury was impaneled before the parties had a chance to question her.

Currie's counsel raised an objection to the Jones strike based on *Batson v. Kentucky*, 476 U.S. 79 (1986), and moved for a mistrial. Defense counsel told the trial judge that he did not believe the prosecutor had "any basis whatsoever" to strike Jones, other than her race. The judge stated that he was "aware that striking a single person of a minority background is sufficient for a prima facie showing if the evidence gives rise to a reasonable inference that it is based on ra[c]e rather than on nonprohibited grounds." After hearing from defense counsel and the prosecutor, the trial judge concluded that based on his observation of the facts no prima facie showing of racial discrimination had been made. The judge observed that there was "a very reasonable basis" to strike someone like Juror Jones because "Jones' brother has been prosecuted on drug cases . . . [and] her cousin was prosecuted on drug cases." The judge said he did not "believe that the prosecutor is required to take the risk that either subconsciously or during the presentation of evidence her feelings" might make her biased against Currie's prosecutor "in light of the very close relationship she has with two people who have been

prosecuted." The judge apparently was referring to the arrests of Jones' brother and cousin for suspected drug crimes, although it is not clear whether those arrests led to prosecutions.

After concluding that defense counsel failed to make a prima facie showing of discrimination, the trial judge next invited the prosecutor to state for the record any reasons why he struck Juror Jones. The prosecutor obliged and first agreed with the court's reasoning as to the possible effect on Jones of her close family's drug arrest record. Next, the prosecutor pointed out that Jones had answered "no" on a questionnaire that asked if a family member had been a defendant in a criminal matter and then answered "yes" to a question about whether one of her family members had been arrested. The prosecutor apparently considered these answers to be inconsistent, even though they are not necessarily irreconcilable since one referred to criminal prosecutions and the other referred merely to arrests. The prosecutor also pointed out that in response to a question regarding whether any of her family members "had a drug problem," Jones had answered "yes" and written "several family members have crack before" [sic]. Finally, the prosecutor pointed out that Jones wrote on a questionnaire that she did not know what the defendant was accused of, even though the trial judge had already advised Jones and other prospective jurors that the defendant was charged with second degree murder and other crimes. The prosecutor then reemphasized that Jones had "a close relation such as a brother" potentially involved in a suspected drug crime.

The trial judge reiterated that he denied the motion based on the absence of a prima facie showing of discrimination. The judge also said that be believed that the prosecutor's

stated reasons were not pretextual. The trial proceeded. Currie was convicted, again, of second degree murder, attempted robbery, and being a felon in possession of a firearm.

Currie appealed his conviction to the California Court of Appeal. *People v. Currie*, No. A123708, 2011 WL 63083 (Cal. Ct. App. Jan. 10, 2011), *as modified on denial of reh'g* (Jan. 31, 2011). He argued that the trial court's denial of his *Batson* motion violated his constitutional rights. According to Currie, the trial court applied the wrong legal standard at *Batson*'s first, prima facie step by supposedly requiring him to show that it was "more likely than not" that the prosecutor struck Jones because of her race. The appellate court rejected this argument because the trial judge never mentioned a "more likely than not" standard, and because the trial judge required only that Currie proffer evidence that "gives rise to a reasonable inference" that the challenged strike was motivated by race. The appellate court went on to hold that "[s]ubstantial evidence supports the trial court's stated conclusion that [Jones] was not a desirable panelist for the prosecution because she had two relatives who had been arrested for drug offenses, and that consequently, no prima facie case had been made." *Id.* at *7.

Currie argued that the appellate court was obligated to undertake a comparative analysis among Jones and the seated jurors. The appellate court rejected this argument because the trial judge applied the correct legal standard during the prima facie step and explicitly found that Currie failed to show that there was a reasonable inference that the prosecutor was motivated by race. The appellate court went on to perform a comparative analysis anyway, and it concluded that "[s]ubstantial evidence supports the trial court's finding that the prosecutor did not excuse [Jones] based on her race." *Id.*

at *10. The appellate court affirmed Currie's conviction. *Id.* at *20.

Currie filed a petition for review in the Supreme Court of California, which was denied without opinion. He filed the instant petition for writ of habeas corpus in federal district court, which raises the same *Batson* claim. The district court denied the habeas petition. On appeal to us, he argues that the court erred when it denied his petition.

## III.

Our review of Currie's habeas petition is limited in scope by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Here, the California Court of Appeal adjudicated Currie's *Batson* claim on the merits, and Currie raises the same *Batson* claim in his federal habeas petition. AEDPA bars federal courts from granting Currie's petition unless the California Court of Appeal unreasonably applied clearly established Federal law or based its decision on factual determinations that are unreasonable in light of the evidence before it.

**IV.**

**A.**

We are called upon to ascertain the "clearly established Federal law, as determined by the Supreme Court of the United States" with respect to *Batson* challenges.

The Supreme Court of the United States explained the proper analysis for *Batson* claims in *Johnson v. California*, 545 U.S. 162 (2005) [hereinafter *Johnson*]. In *Johnson*, a prosecutor struck three African American jurors. *Id.* at 165. Defense counsel raised a *Batson* objection after the first two strikes. *Id.* The trial judge warned that "we are very close" to establishing a prima facie *Batson* case, but the judge concluded that no such case had been established because there was not a "strong likelihood" that the strikes were motivated by race. *Id.* The judge "simply found that [the defendant] had failed to establish a prima facie case" and did not ask the prosecutor to explain the rationale for the strikes. *Id.* Then, the prosecutor struck the third African American juror, and defense counsel objected again and argued that the prosecutor was engaging in "a systematic attempt to exclude African-Americans from the jury panel." *Id.* The trial judge opined "that the black venire members had offered equivocal or confused answers in their written questionnaires." The judge said "there were answers . . . at least on the questionnaires themselves [such] that the Court felt that there was sufficient basis" for the strikes. *Id.* at 165–66. The judge concluded that the defendant failed to establish a prima facie case and did not ask the prosecutor for an explanation. *Id.* at 165–66.

The defendant pursued a direct appeal to the Supreme Court of the United States. The Court identified the following issue and standard:

> The issue in this case is narrow but important. It concerns the scope of the first of three steps this Court enumerated in *Batson*, which together guide trial courts' constitutional review of peremptory strikes. Those three *Batson* steps should by now be familiar. First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."

*Id.* at 168 (citations omitted).

The Court rejected the standard then used by California courts at the first step of *Batson*, which required a defendant to show that it was "more likely than not" that the prosecutor exercised a peremptory strike based on race. *Id.* This standard asked too much of defendants. "Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* at 170.

The Court applied this standard to the facts of *Johnson*. It noted that the state supreme court observed it was "suspicious" that three African American jurors were removed from the jury, and that the trial judge said "we are very close" to a prima facie *Batson* case after the prosecutor twice struck African American jurors. The Court held that "[t]hose inferences that discrimination may have occurred were sufficient to establish a prima facie." *Id.* at 173.

In reviewing habeas petitions, we have relied on the Court's holding in *Johnson* to determine whether a state court decision "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For instance, in *Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006), we held that the California Court of Appeal applied the wrong legal standard because it failed to recognize that the defendant's *Batson* objection was "only required to raise an inference of purposeful discrimination" to pass muster at step one, *id.* at 1110. The prosecutor in *Williams* used peremptory challenges to excuse three African American jurors. *Id.* at 1103. The defendant objected, and the trial judge summarily concluded that the defendant failed to establish a prima facie case of discrimination. *Id.* at 1104. The trial judge did not explain this finding and did not ask the prosecutor to provide an explanation. *Id.* The California Court of Appeal affirmed the trial court. *Id.* It held that "from all the circumstances of the case," the defendant had not shown "a strong likelihood that such persons are being challenged because of their group association." *Id.* Thus, the state appellate court plainly applied the wrong legal standard when it reviewed the defendant's *Batson* claim. In light of this critical flaw, we noted that "where the state court used the 'strong likelihood' standard for reviewing a *Batson* claim, the state court's

findings are not entitled to deference and our review is de novo." *Id.* at 1105 (citing *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004)). Applying de novo review, we determined for ourselves whether the defendant had raised an inference of purposeful discrimination at step one of *Batson*. We found that the prosecutor's use of peremptory strikes against three African American jurors raised such an inference, and we did not believe that this inference was refuted by the state appellate court's post-hoc rationalization that the trial court record "could have" supported race-neutral reasons for the strikes. *Id.* at 1110. The state appellate court was confined to hypothesizing potential race-neutral reasons to justify the strike because the trial judge denied the *Batson* motion at step one without explanation.

We revisited *Batson*'s step one analysis in *Johnson v. Finn*, 665 F.3d 1063 (9th Cir. 2011) [hereinafter *Finn*]. A state prosecutor exercised peremptory strikes against three African American jurors, and the defendants objected on *Batson* grounds. *Id.* at 1066. The trial judge found that the defendants failed to make out a prima facie case of discrimination. *Id.* The California Court of Appeal affirmed the trial court. *Id.* at 1068. The defendants raised the *Batson* claim in a federal habeas petition. *Id.* In reviewing the petition, we first analyzed whether the California Court of Appeal applied the proper legal standard when it adjudicated the *Batson* claim on the merits. *Id.*

As in *Williams*, we again held that the state court applied the wrong legal standard. *Id.* In applying step one of *Batson*, the California Court of Appeal relied on *People v. Box*, 23 Cal. 4th 1153 (2000). *Box* stated that "in California, a 'strong likelihood' means a 'reasonable inference.'" *Id.* at 1188 n.7. By relying on *Box*, the state appellate court in *Finn*

failed to apply the legal standard followed by the United States Supreme Court in *Johnson*. In *Johnson*, the Court explicitly rejected California's "strong likelihood" standard at *Batson* step one. *Johnson*, 545 U.S. at 166. In reviewing the proceedings at issue in *Finn*, we held that "[a] state court that equates a correct standard with an incorrect standard cannot be applying the correct standard in the manner required by law." *Finn*, 665 F.3d at 1068. We went on to note that there was "strong[] evidence" that the state appellate court applied the incorrect "strong likelihood" standard. *Id.* This "evidence" was that the state appellate court wrote that it would affirm the trial judge's step one *Batson* ruling so long as "there are grounds upon which a prosecutor could reasonably have premised a challenge." *Id.* This statement was in tension with *Williams v. Runnels*, in which we reviewed a *Batson* claim de novo and opined that "to rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges." *Williams*, 432 F.3d at 1108.

Because the state appellate court applied the wrong legal standard in *Finn*, we proceeded to review the *Batson* claim de novo. *Finn*, 665 F.3d at 1070. We wrote that "[t]he fact that three of the prosecution's peremptory challenges were exercised against the only three African-Americans in the jury pool is enough to establish a prima facie case of racial discrimination." *Id.* (internal quotation marks omitted). We held, on de novo review, that the defendants did make a prima facie showing of racial discrimination at *Batson* step one. *Id.* at 1071.

Before proceeding to analyze the California Court of Appeal decision in this case, it is worth summarizing the foregoing authorities: In *Johnson*, the Supreme Court rejected California's "strong likelihood" standard at *Batson* step one. "Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination occurred." *Johnson*, 545 U.S. at 170. In *Williams*, we concluded that the state appellate court misapplied clearly established Federal law because it used the "strong likelihood" standard at *Batson* step one. *Williams*, 432 F.3d at 1105. We proceeded to analyze the *Batson* claim de novo. *Id.* Similarly, in *Finn*, we concluded that the state appellate court misapplied clearly established Federal law because it relied on a California case that equated the "reasonable inference standard" with the incorrect "strong likelihood" standard. *Finn*, 665 F.3d at 1068. Thus, we proceeded to analyze that *Batson* claim de novo as well. *Id.*

## B.

Here, the California Court of Appeal's adjudication of Currie's *Batson* claim did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1). Unlike the proceedings we reviewed in *Williams* and  *Finn*, here there is "strong evidence" that the state court was aware of, and applied, the inference standard from  *Johnson v. California*. This evidence principally consists of the fact that the state appellate court cited, quoted, and discussed *Johnson* when it adjudicated Currie's step one *Batson* claim. The appellate court noted that "[i]n *Johnson*, the high court clarified that the first prong of *Batson* is

satisfied where the record supports an 'inference' of discrimination, and rejected California decisions requiring proof of a 'strong likelihood' of discrimination." *People v. Currie*, No. A123708, 2011 WL 63083, at *7 (Cal. Ct. App. Jan. 10, 2011), *as modified on denial of reh'g* (Jan. 31, 2011). Furthermore, the appellate court observed that "[t]he trial court here was well aware of *Johnson* (which was decided three years before the voir dire in this case) and specifically articulated the 'inference' standard when ruling on the [*Batson*] motion." *Id.* This observation is supported by the record before the appellate court, which shows that the judge said he was "aware that striking a single person of a minority background is sufficient for a prima facie showing if the evidence gives rise to a reasonable inference that it is based on ra[c]e rather than on nonprohibited grounds." These facts support only one conclusion: the California Court of Appeal reasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States" when it adjudicated Currie's step one *Batson* claim.

## C.

My colleagues in the majority see things differently. They conclude that the California Court of Appeal violated clearly established Federal law, as determined by the Supreme Court. The majority supports this conclusion not with a Supreme Court case, but with our discussion in *Finn*. However, the Ninth Circuit does not speak for the Supreme Court. When we review habeas petitions subject to AEDPA, "[w]e must keep in mind that 'only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied.'" *Murray v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014) (quoting *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer*

*v. Andrade*, 538 U.S. 63, 71 (2003)). "Our precedent *cannot* be mistaken for clearly established Supreme Court law." *Id.* (citing *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450–51 (2013)).

The majority points to our statement in *Finn* that the California Court of Appeal apparently applied the wrong standard at *Batson* step one in part because the appellate court said it would affirm a trial court's step one ruling "so long as 'there are grounds upon which a prosecutor could reasonably have premised a challenge.'" *Finn*, 665 F.3d at 1068. In the present case, my colleagues point out, the California Court of Appeal quoted a California case stating that an appellate court "will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." *People v. Hoyos*, 41 Cal. 4th 872, 900 (2007). Thus, similar language appears in both the challenged decision in the present case and in the challenged decision under review in *Finn*. Given this shared language, my colleagues conclude that since the California Court of Appeal acted contrary to Federal law in *Finn*, it did so here as well.

The majority's analysis is incorrect for three reasons.

First, *Finn* did not hold that the appellate court's statement established that the court acted contrary to Federal law. There was a much bigger problem with the appellate court's decision: it relied on *People v. Box*, 23 Cal. 4th 1153 (2000), which incorrectly conflated the "reasonable inference" standard with California's "strong likelihood" standard. This is the primary reason in *Finn* why we concluded that the state court acted contrary to Federal law. By contrast, here the state trial court and the California Court

of Appeal relied on the "reasonable inference" standard from *Johnson*. The courts did not rely on *Box*.

Second, *Finn* does not demonstrate that it is contrary to clearly established Federal law, as determined by the Supreme Court, for a state appellate court to affirm a step one *Batson* ruling "so long as 'there are grounds upon which a prosecutor could reasonably have premised a challenge.'" *Finn*, 665 F.3d at 1068. *Finn* is not a Supreme Court case, and *Finn* did not rely on a Supreme Court case when it criticized the appellate court's rule statement. Instead, *Finn* relied on *Williams v. Runnels*, which is a Ninth Circuit decision.

In *Williams*, we reviewed a habeas petition de novo and determined that the California Court of Appeal "did not adequately protect" a defendant's rights under the Equal Protection Clause when it ruled on a *Batson* claim by focusing on "whether the [trial] record could support race-neutral grounds for the prosecutor's peremptory challenges." *Williams*, 432 F.3d at 1108. The *Williams* court arrived at this conclusion based on its reading of *Johnson*. However, *Johnson* itself does not spell out such a rule. Instead, the *Williams* court refined the general principle from *Johnson* into a specific legal rule that now applies to de novo review of *Batson* claims in the Ninth Circuit. The *Williams* rule is not "clearly established Federal law, as determined by the Supreme Court." We have been repeatedly reminded by the Supreme Court not to treat our own precedent as Supreme Court law. *E.g.*, *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) ("Circuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced."). The fact that we reiterated the *Williams* rule in *Finn* does not change this

analysis. We do not speak for the Supreme Court, even when we say the same thing twice.

Third, even if it were contrary to clearly established Federal law for an appellate court to pass on a *Batson* claim simply because it could dream up "grounds upon which a prosecutor could reasonably have premised a challenge," *Finn*, 665 F.3d at 1068, that is an inaccurate description of what actually happened in Currie's case. The California Court of Appeal did not affirm Currie's murder conviction by imagining a possible rationale for striking Juror Jones. Instead, the appellate court examined the trial record to determine whether substantial evidence supported the trial judge's rationale for finding that Currie failed to establish a prima facie case at *Batson* step one. Appellate courts typically operate this way. They review findings of fact made by trial courts for substantial evidence. Nothing about this approach is contrary to "clearly established Federal law, as determined by the Supreme Court." My colleagues in the majority do not offer much clarity as to what, exactly, a state appellate court is allowed to do when it reviews a trial court's *Batson* step one finding–other than overturn it.

In sum, the California Court of Appeal did not unreasonably apply Federal law when it adjudicated Currie's *Batson* claim. The appellate court applied the standard from *Johnson v. California*, 545 U.S. 162 (2005), and nothing in the record shows that it applied the *Johnson* standard unreasonably or in a manner contrary to clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

**V.**

**A.**

Our review of Currie's federal habeas petition does not end simply because the state appellate court applied the correct legal standard. We must also consider whether the California Court of Appeal's adjudication of his *Batson* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Here, the determination under review is the California appellate court's conclusion that substantial evidence supported the trial judge's denial of the *Batson* motion at step one. The appellate court had before it the voir dire transcript and the questionnaires from jury selection. It determined that "[s]ubstantial evidence supports the trial court's stated conclusion that [Jones] was not a desirable panelist for the prosecution because she had two relatives who had been arrested for drug offenses, and that consequently, no prima facie case had been made."

In assessing the reasonableness of the appellate court's determination, we are guided by *Johnson*. In *Johnson*, the Supreme Court held on direct appeal that a prima facie case had been made out where the prosecutor struck three African American jurors, a tactic that the state courts themselves described as "suspicious" and "very close" to a *Batson* violation. *Johnson*, 545 U.S. at 173. The trial judge perceived the *Batson* claim as a close call but concluded that no prima facie case had been shown because the three African American jurors had provided "confused answers in their written questionnaires." *Id.* at 165.

*Williams* is also instructive. In *Williams*, the prosecutor struck three African American jurors. *Williams*, 432 F.3d at 1103. The trial judge summarily denied the defendant's *Batson* motion without analysis and without seeking an explanation from the prosecutor. *Id.* at 1104, 1108. We reviewed the *Batson* claim de novo. We noted that the trial judge's summary handling of the motion limited our ability to determine whether any relevant circumstances undermined the inference of race discrimination. *Id.* at 1108. Our review of the record "fail[ed] to disclose a refutation of the inference of bias" raised by striking three African American jurors. *Id.* at 1109. Thus, we determined that the defendant had made out a prima facie case at *Batson* step one. *Id.*

Currie's case is different.

The People of California sought to convict Currie, himself a drug user, for murdering his drug dealer after the two got in an argument. During jury selection, the trial judge heard from Juror Jones that both her brother and her cousin had been arrested for suspected drug crimes. Soon thereafter, the prosecutor peremptorily struck Jones. This was the prosecutor's sixth peremptory strike, and his first and only peremptory strike of an African-American juror from that venire. Currie raised a *Batson* objection, and the trial judge listened to Currie's explanation of his objection. The trial judge found that no prima facie case had been made. The trial judge then explained his reasoning for the record: he believed Jones could pose a risk to the state's prosecution of a drug user since her brother and cousin had been arrested for suspected drug crimes. In light of this, the judge did not believe that the prosecutor's strike of Jones raised the inference that the strike was motivated by the color of Jones' skin.

It was not unreasonable for the California Court of Appeal to conclude that the inferential support for the presence of racial animus to explain the peremptory challenge of Jones was not as strong as the evidence in *Johnson*, in which the trial judge observed that the prosecutor came "very close" to violating *Batson* by striking three African American jurors and the judge offered only a cursory explanation for finding that no prima facie case had been made. *See Johnson*, 545 U.S. at 165 ("Specifically, the judge opined that the black venire members had offered equivocal or confused answers in their written questionnaires."). By contrast, here the trial judge offered a specific reason for why striking one juror in particular, Jones, did not give rise to the inference that the prosecutor struck her because of race. Furthermore, the facts of this case differ from *Williams*, in which the trial judge summarily found (without explanation) that the prosecutor's peremptory strikes of three African Americans did not give rise to a reasonable inference of discrimination. Here, the California Court of Appeal had the benefit of the trial judge's reasoning when it adjudicated Currie's *Batson* claim. In light of this, it was not unreasonable for the appellate court to find that substantial evidence supported the trial judge's ruling.

**B.**

My colleagues in the majority again see things differently. They conclude that the appellate court's finding was unreasonable in light of a comparative analysis with other jurors who were allowed to serve.

As part of this analysis, the majority writes that it is "troubling" that the prosecutor's explanations for the strike "were largely adopted from the reasons the trial judge had already suggested, during his discussion of *Batson* step one."

This is a perplexing critique of the trial court's handling of the objection. It is a good thing when trial judges explain themselves. This practice helps a great deal when appellate courts review their findings for substantial evidence. Furthermore, we explicitly noted in *Williams* that it was difficult to review the trial court's step one finding because the judge simply stated, without explanation, that there was no prima facie showing of discrimination. Here, the trial judge avoided this problem by stating his reasoning for the record. It would have been unwise not to. The fact that the prosecutor later agreed with the judge's reasoning is unremarkable. If anything, the agreement between the judge and the prosecutor is an indication that there was, in fact, a clear race-neutral justification for the strike.

The majority instead chooses to discredit and distrust the prosecutor because he agreed with the judge's reasoning. This theory will now control how we review adjudications of *Batson* challenges in state courts, and it is unclear what those courts should do at step one. A judge who stays silent tempts fate, as does one who speaks. The consequences of this rule are evident here, as the majority sets aside a conviction on *Batson* grounds even when the trial judge observed a reason for a strike as obvious as a juror's family's prior drug arrest records in a drug-based murder case.

The majority goes on to analyze other reasons that the prosecutor offered for striking Jones. The majority finds it "unreasonable" for the prosecutor to have struck Jones (in part) because her family members had drug problems. The majority points out that other, seated jurors had drug problems themselves or had relatives who had drug problems. The majority also notes that some of the seated jurors were similar to Jones because they answered some parts of the

juror questionnaire the same way that she did. By choosing to emphasize these similarities, the majority opinion elides the key difference between Jones and the other jurors: only Jones had a brother and cousin who were arrested for suspected drug crimes. The majority downplays this fact and chooses to focus on others. However, "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus." *Rice v. Collins*, 546 U.S. 333, 342 (2006).

## VI.

The majority today tells the People of California that they must thrice try Currie for murder, or set him free. I cannot join them in this task. The state appellate court's adjudication of Currie's *Batson* claim did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States", and it did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). His habeas petition "shall not be granted." *Id.* Accordingly, I respectfully dissent from the majority's decision to grant it.